Wes Felix (#6539)
PIA HOYT, LLC
170 S. Main Street, Suite 1100
Salt Lake City, Utah 84101
Tel: (801) 350-9000
wfelix@piahoyt.com

*Attorney for the Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DOUGLAS GOLDSMITH, an individual, GOLDSMITH PROPERTIES, LLC a Utah limited liability company<br><br>           Plaintiffs,<br><br>vs.<br><br>KEVIN G. LONG, an individual; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK BLYTHEVILLE, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a Utah company; MARK MACHLIS, an individual; and GREEN IVY REALTY, INC., a Utah corporation,<br><br>           Defendants. | **COMPLAINT**<br><br>**[JURY DEMAND]**<br><br><br>Case No. _____ |

Plaintiffs Douglas Goldsmith and Goldsmith Properties, LLC (collectively "Goldsmith") by and through undersigned counsel, hereby complain against Defendants Kevin Long; Millcreek Commercial Properties, LLC; Millrock Blytheville, LLC; Millrock Investment Fund 1, LLC; Colliers International; Mark Machlis; and Green Ivy Realty, Inc., as follows:

**INTRODUCTION AND BACKGROUND**

1. Defendants conspired with one another and with other individuals to engage in a nation-wide scheme to defraud Goldsmith and others by inducing them to invest in tenant-in-common ("TIC") interests in commercial properties bundled with sham long-term leases (the "Colliers/Millcreek Scheme"). The properties were sold at three or more times the actual value of the real estate. The inflated price was justified by the return on investment through guaranteed long-term leases. Defendants knew the lessors were shell entities with no substantive assets. Defendants knew there was no economic basis for the lease terms and that there was no reason to believe that the lessor shell entities would be able to perform on the leases. This information was hidden from purchasers.

2. In addition, to support the fictitious leases, Defendants paid the first year or more in "rents" from investor money. Without using investor money to pay "rents" to new investors the Colliers/Millcreek Scheme would have immediately collapsed, and the fraud would have been revealed.

3. Typically, leases were executed and guaranteed by shell entities known to the Defendants to be incapable of performing under the terms of the leases. In addition, Defendants falsely represented that the leases were supported by a bond from Lloyds of London.

4. In this case, Goldsmith purchased a commercial property from Defendants in Blytheville, Arkansas for $2,829,478. The purchase price was marketed as safe and reasonable based upon a on a 20-year lease agreement with HealthCare Solutions Holdings Inc. ("HSH") that would return between 6% and 9% on the invested money.

5. In fact, the property was worth less than one third of the value represented by Defendants. Unknown to Goldsmith, Defendants purchased the Blytheville property for $845,000. Immediately thereafter Defendants sold Blytheville to a shell entity, American Medical

Management ("AMM"), for $1,825,000.  Defendants then sold Blytheville together with a long term guaranteed lease to Goldsmith for $2,828,478.  Defendants told Goldsmith the purchase price was reasonable based upon the terms of the included lease. Defendants knew that in fact the lease was worthless.

6. Defendants made monthly "rent" payments to Goldsmith of $14,447.92.  The rent payments were secretly made from money invested by Goldsmith.  The payments lasted eighteen (18) months, and then it became clear there was no real entity behind the lease payments or the putative surgical center. Rent payments ceased. HSH ceased making any payments on or before December 2021.  This fact was withheld from Goldsmith. The shell entity HSH declared bankruptcy on September 15, 2023.

7. On information and belief, Blytheville is currently worth roughly $507,000.  The two-million-dollar difference between the actual value of the property and the purchase price paid by Goldsmith was pocketed by Defendants in undisclosed commissions and referral fees or simply taken as undisclosed "profits."

## PARTIES

8. Plaintiff Douglas Goldsmith is an individual residing in Salt Lake County, Utah.

9. Plaintiff Goldsmith Properties, LLC is a Utah limited liability company and is an entity created for the purpose of purchasing the Blytheville, Arkansas property.

10. Defendant Kevin G. Long ("Long") is an individual residing in Utah.

11. Long was a co-founder, Senior Vice President and Executive Vice President of Millcreek Commercial Properties, LLC and Colliers International Utah division, as shown in his email signature from communications and excerpt from his personal LinkedIn page:








Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

Experience


President of Millcreek Commercial with Colliers International | Utah
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

12. Long is the managing agent for Millrock Investment Fund 1 and Millrock Blytheville, LLC.

13. At all relevant times, Long was an employee and agent for Colliers International.

4

14. Defendant Millcreek Commercial Properties, LLC ("Millcreek Commercial") is a Utah limited liability company with its principal place of business in Salt Lake County, Utah.

15. Defendant Millrock Blytheville, LLC is a Utah limited liability company.

16. Defendant Millrock Investment Fund 1, LLC is a Utah limited liability company.

17. Millrock Investment Fund 1, LLC is a small family fund that markets properties through Millcreek Commercial Properties, LLC.

18. Thomas Smith, is a principal and agent of Millrock Investment Fund 1, LLC.

19. Defendant Colliers International ("Colliers") is an international real estate and investment services company. Colliers maintains at least four offices in Utah.

20. At all times relevant, employees and agents of Colliers working through and with Millcreek Commercial sold the Blytheville investment.

21. Defendant Mark Machlis ("Machlis") is an individual residing in Salt Lake County, Utah.

22. Machlis is the registered agent of Green Ivy Realty and a development partner of Millrock Investment Fund 1.

23. On information and belief, Machlis worked as an agent for Millcreek Commercial in connection with the sale of the Blytheville Property.

24. Defendant Green Ivy Realty, Inc is a Utah company.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 over the claims arising under federal law including 15 U.S.C. § 78j(b), 15 U.S.C. § 78t(a) and 15 U.S.C. § 77l.

26. The Court has supplemental jurisdiction over the state law claims asserted pursuant to 28 U.S.C. §1367.

27. Venue is appropriate under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 78aa.

28. In connection with the conduct alleged in this Complaint the Defendants availed themselves of the means of interstate commerce including the internet, telephone and mail.

## THE SCHEME

29. Millcreek Commercial Properties, LLC ("Millcreek Commercial") actively markets tenant-in-common ("TIC') interests in commercial real estate as safe and secure investments offering a guaranteed source of long-term income. Frequently, Millcreek Commercial pitched the TIC investments to potential buyers in need of a way to utilize the tax benefits of an exchange under IRS Section 1031. Purchasers in a 1031 exchange are ideal marks for unscrupulous sellers as they are under strict time constraints when identifying and buying the exchange property.

30. Millcreek Commercial was co-founded and run by Kevin Long of Colliers International ("Colliers") and acted in partnership with Colliers in marketing and selling the TIC securities investments. Millcreek Commercial marketed its properties over the internet, through mail and using other means of interstate communication.

31. Millcreek Commercial, along with its co-conspirators including Millrock Investment Fund 1, LLC, would purchase commercial properties and then enter into long-term lease agreements at highly inflated prices. Millcreek Commercial would then market the properties to potential investors with long-term leases representing that the leases provided a safe and secure source of passive income.

32. The lease terms were in fact so extravagant that it was clear to Defendants from the outset that the lease terms could not be met. To hide the scheme, Defendants would pay the first year to two years of rent to investors from invested money, thereby postponing the collapse of the scheme while Millcreek Commercial continued to defraud new investors.

33. Millcreek Commercial stated that investors could, "[r]est assured that our portfolio is rock solid. We vigorously vet very property that we offer." They represented that they sold only properties with tenants who can "thrive in any economic environment," as shown in this excerpt from Millcreek Commercial's website, on a page called "1031 Exchange":

> **Exchanging Hassle For Happiness.**
>
> Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

34. In fact, Millcreek Commercial's leases were often with shell entities without real assets or ability to pay the inflated rents.

35. One "dream tenant" working with Millcreek Commercial was Healthcare Solutions Holdings Inc. ("HSH"). Millcreek Commercial and its co-conspirators represented that HSH was a publicly-traded medical company focused on providing clinicians with "state of the art diagnostic and therapeutic tools," as shown in this excerpt from the Marketing Materials:

> **Backed By Strength**
>
> Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

36. Millcreek Commercial stated that HSH "will capture revenue and margins that have historically been 'lost' resulting in "significantly enhanced operating margins."

37. In fact, HSH was a shell company without any substantive operations or assets. HSH is a wholly owned subsidiary of Health Care Solutions Management Group, Inc. ("HSMG").

HSMG was forced into involuntary bankruptcy in September of 2023. Delaware Bankruptcy Court, Case No. 1:23-bk-11458.

38.  Joshua Constantin, the Head of Commercial Real Estate for HSH, was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment advisor, or from associating with any broker, dealer, investment advisor, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court for the Southern District of New York.

## THE BLYTHEVILLE TRANSACTION

39.  In early 2021, HSH with the cooperation of Millcreek Commercial and Millrock Investment Fund 1, purchased a commercial property in Blytheville, Arkansas for $845,000. HSH formed an entity, American Medical Management ("AMM") to make the purchase. The property was immediately resold to Millrock Blytheville, LLC a wholly owned subsidiary of Millrock Investment Fund 1 for $1,825,000.

40.  The property was marketed by Millcreek Commercial, Millrock, Long, and Machlis to Goldsmith. Goldsmith was told that HSH had already agreed to be the tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue. Goldsmith would receive rent of $14,447.92 per month. Goldsmith was promised a 7.25% return on his investment of $2,825,478.81. Goldsmith was also told that new TIC investors would be brought in and that their investment money would be used to improve the property.

41.  Goldsmith was not told that HSH purchased the property and then resold it the same day to Millrock with HSH and Joshua Constantin taking a million dollars out of the deal.

42.  Goldsmith was not told that HSH agreed to then lease the property back from Millrock. Goldsmith was not told that Dr. Mahmood had worked for HSH but had been fired

8

before the property was sold to Goldsmith and that Dr. Mahmood was no longer working at the Blytheville facility.

43. Goldsmith was also not told that the "rent" he received for two years was paid out of his own invested money. Goldsmith was not told that there was no tenant paying rent.

44. Goldsmith was also told that part of the property was leased by UPS and that the leased portion of the property was part of the sale. It was not.

45. At closing, Goldsmith was given a twenty-year lease agreement with Millrock Blytheville, LLC with options to extend to one hundred years. The lease provided for rent of $14,447.92 during a construction period of roughly two years then escalating to $17,094.77. In reality, Millrock Blytheville, LLC had only Goldsmith's invested money minus an undisclosed amount of money siphoned off by Defendants as fees, commissions and profits.

46. HSH filed for bankruptcy less than two years after the closing.

47. Goldsmith was not told that Machlis worked as an agent for Millcreek Commercial. Machlis received a 5.5% brokerage fee. This was not disclosed to Goldsmith until after the closing. Similarly, Goldsmith was not told that Long and Colliers would receive at least 2% as an additional agents' selling fee.

48. Goldsmith was not told by Defendants that HSH and its subsidiaries had defaulted on lease payments in other properties.

49. Goldsmith was not told that all "rent" from tenants ceased by December of 2021.

50. To conceal the fraud, Goldsmith was paid "rent" by Millcreek Blytheville for almost two years. He was told that Millcreek Blytheville had no more funds, i.e., Goldsmith's funds. He then learned there was no cardiologist working at Blytheville, that there was no rent being paid to Blytheville and no lease.

51. In addition, Millcreek Blytheville and Millrock Investment Fund 1, claimed to have used over $300,000 of Goldsmith's money for "architectural plans." On information and belief, that money was stolen by Defendants. No plans have ever been provided.

52. Goldsmith lost approximately two million dollars on the Blytheville investment.

### FIRST CAUSE OF ACTION
**(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder Against All Defendants)**

53. By this reference, the foregoing allegations are realleged and incorporated herein.

54. Investment in the Blytheville Property bundled with the guaranteed 20-year lease was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, Millrock Blytheville, LLC the HSH Parties as tenants, guarantor, and affiliated entities.

55. Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

56. The material misrepresentations and omissions were made in connection with the offer to sell a security.

57. Such material misrepresentations and omissions include, in addition to those previously alleged and incorporated herein:

   a. That Goldsmith would receive a return of roughly 7.25% over the initial 20-year lease term;

   b. That the tenant was a "dream tenant;"

   c. That the guarantor was a solvent company;

   d. That the initial purchase of the Blytheville property was nearly two million less than the sales price to Goldsmith and that the second sale of the property for a million more occurred on the same day as Goldsmith's closing;

  e. That this was a Lloyd's of London-backed bond in place in case of tenant and guarantor default; and

  f. That Millcreek Commercial's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

58. Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with Plaintiffs or through Marketing Materials.

59. Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

60. Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with reckless disregard for their truth.

61. Plaintiffs justifiably relied on the foregoing misrepresentations and omissions.

62. Goldsmith suffered substantial injury because of Defendants' misrepresentations and omissions in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Sale of Unregistered Securities Against All Defendants)

63. By this reference, the foregoing allegations are realleged and incorporated herein.

64. Investment in the Blytheville Property was a security as defined in 15 U.S.C. § 77b(a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others.

65. The Blytheville investment, which is the subject of this Complaint, was not registered by the filing of a registration statement, nor was it exempt from registration through a recognized exemption to registration under the 1933 Securities Act.

66. During the time in which the Colliers/Millcreek Parties marketed the Blytheville Property, they made use of means or instruments of communication in interstate commerce or the mails—including telephone lines, the internet, email transmissions over the internet, and the United States Postal Service—for the purpose of offering, selling, and delivering interests in the Blytheville Property, in violation of Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. § 77e(a) and (c)).

67. Pursuant to Section 12(a)(1) of the Securities Act (15 U.S.C § 77l (a)(1)), by reason of Defendants' violation, Defendants are liable to Plaintiffs in an amount equal to the consideration paid for such security with interest thereon, less the amount of any income received thereon upon tender of such security. For purposes of this Cause of Action only, Plaintiffs hereby tender their investment interest in the Blytheville Property to Defendants upon receipt of the amounts specified in this Complaint, as may be proven at trial.

68. In the alternative, Plaintiffs are entitled to an award of damages in an amount to be proven at trial and all other applicable relief provided by law.

**THIRD CAUSE OF ACTION**
**(Control Person Liability Under the Securities Exchange Act Against Long)**

69. By this reference, the foregoing allegations are realleged and incorporated herein.

70. Millcreek Commercial and Colliers International, named as Defendants in Plaintiffs' First and Second Causes of Action, are liable under Chapter 2B of Title 15 of the United States Code, the Securities Exchanges Act of 1934, and are referred to in this Cause of Action as the "Liable Persons."

71. At all times relevant to this Complaint, the Defendants identified in this Third Cause of Action controlled the Liable Persons, as follows:

    a. Defendants were officers, directors, agents, or other control people of entities that are Liable Persons;

    b. Defendants had authority over the Liable Persons as employers, supervisors, or persons with the ability to affect the terms of the Liable Person's employment or livelihood;

    c. Defendants exercised actual control over the Liable Persons through authority, economic influence, contractual rights, or the use of dominant bargaining power or position;

    d. Liable Persons willingly submitted to and complied with the instruction, direction, or authority of Defendants;

    e. Defendants participated in the business operations of the Liable Persons generally.

72. Defendants had power over the specific transactions and activities at issue in this Complaint.

73. With respect to their conduct and control of the Liable Persons relating to the matters addressed in the First Cause of Action, Defendants did not act in good faith, and the acts of Defendants did directly or indirectly induce the acts of the Liable Persons.

74. Pursuant to Section 20(a) of the Securities Exchange Act (15 U.S.C. § 78t (a)), Defendants are jointly and severally liable with and to the same extent as the Liable Persons, and Plaintiffs are therefore entitled to a Judgment against Defendants awarding damages in an amount to be proven at trial, but which is the equivalent of any award determined under any other applicable cause of action.

**FOURTH CAUSE OF ACTION**
**(Common Law Fraud against Long, Machlis, Millcreek Commercial Properties, LLC, and Colliers International)**

75. By this reference, the foregoing allegations are realleged and incorporated herein.

76. Defendants made false statements about material facts regarding the Blytheville Property, including the representations within the Marketing Materials and the representations made to the Plaintiffs directly by Long and Machlis.

77. Defendants made the statements knowing that they were false.

78. Alternatively, Defendants made the statements recklessly and without regard for their truth.

79. Defendants intended that Plaintiffs would rely on the statements.

80. Plaintiffs reasonably relied on the statements by investing in the Blytheville Property.

81. As a result of Defendant's conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

82. Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiff's rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

**FIFTH CAUSE OF ACTION**
**(Negligent Misrepresentation Against Long, Machlis, Millcreek Commercial Properties, LLC, and Colliers International)**

83. By this reference, the foregoing allegations are realleged and incorporated herein.

84. Defendants had a duty to determine and disclose fully and fairly all facts that materially affected or related to the condition of the Blytheville Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

85. Defendants made false representations to Plaintiffs as detailed above.

86. Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

87. Defendants knew such representations were false or were negligent in making such representations.

88. Defendants were negligent in investigating the tenant and the corporate guarantor.

89. Defendants knew or should have known the misrepresentations were false.

90. The Defendants made the misrepresentations to induce Plaintiffs to purchase the Blytheville Property for a grossly inflated price.

91. The above misrepresentations and omissions were material.

92. Plaintiffs would not have invested in the Blytheville Property had they known the true facts.

93. Plaintiffs justifiably relied on the foregoing misrepresentations.

94. As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
**(Breach of Fiduciary Duty Against Long, Machlis, Millcreek Commercial Properties, LLC and Colliers International)**

95. By this reference, the foregoing allegations are realleged and incorporated herein.

96. Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the Blytheville Property.

97. Defendants expected that Plaintiffs would put trust and confidence in Defendants and affirmatively invited and encouraged Plaintiff to rely on their judgment and skill regarding their investment in the Blytheville Property.

98. The investment structure and IRS rules relating to 1031 exchanges made Plaintiffs the weaker parties with unique vulnerabilities, including, inter alia, Plaintiffs' age, experience, abilities, and disabilities, and the fact that Plaintiffs were prohibited from actively managing their investment.

99. Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with respect to Defendants.

100. Defendants owed Plaintiffs fiduciary duties of utmost honesty, loyalty, and care.

101. Plaintiffs reposed trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

102. Defendants accepted that trust and confidence from Plaintiffs.

103. Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

104. Defendants also had access to superior and exclusive knowledge about the Blytheville Property investment opportunity, such as information about the financial performance of the tenants, HSH, HSMG, their affiliate entities, and the flow of funds to and from those entities.

105. Defendants breached their fiduciary duties to Plaintiffs by, inter alia, failing to investigate the legitimacy of the tenant and guarantor or concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

106. Defendants' breach of fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

107. As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

108. Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment of Defendants against All Defendants)

109. By this reference, the foregoing allegations are realleged and incorporated herein.

110. Plaintiffs conferred a benefit on the Defendants by making their investment in the Blytheville Property.

111. Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

112. Defendants knowingly benefitted from the proceeds of the Blytheville transaction, and diverted invested money to purposes not benefiting Plaintiffs.

113. Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs.

114. By reason of Defendants' unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants, together with all other applicable relief at law or in equity, including but not limited to a constructive trust requiring to hold funds for Plaintiffs' benefit and return them as ordered by the Court.

115. Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or by law, and such further relief as the Court may deem appropriate under the circumstances.

## EIGHTH CAUSE OF ACTION
**(Conspiracy against All Defendants)**

116. By this reference, the foregoing allegations are realleged and incorporated herein.

117. Defendants combine and conspired with the purpose to induce the purchase of the Blytheville Property based upon material misrepresentations and omissions to Plaintiffs.

118. Defendants further conspired to mislead Plaintiffs and other investors as to the nature of their investment by cooperating with shell entities who would commit to back long-term leases which Defendants knew had no economic value.

119. On information and belief, all Defendants agreed orally, in writing, or implied through their conduct to a scheme whereby property would be sold at highly inflated prices based upon agreements with coconspirators to implement sham long term leases that were only supported through the use of investor money to pay the "rents" on the leases until the scheme inevitably collapsed.

120. As described above, through this conspiracy Defendants sold investments to Plaintiffs at highly inflated prices and with the object of skimming profits from these sales and deceiving investors until the scheme collapsed.

121. As a result of this conspiracy, Plaintiffs sustained and will continue to sustain substantial injury, loss and damages in an amount to be proven at trial.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

A. An award of actual damage and punitive or exemplary damages, attorney's fees, and costs in an amount to be proven at trial, plus any applicable interest.

B. Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

  C. If for any reason the 1031 exchange is deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

  D. Such other relief as may be just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands a trial by jury on all claims so triable in this case.

DATED: July 16, 2024

            PIA HOYT, LLC

            */s/ Wesley D. Felix*
            *Attorney for Plaintiffs*