Wesley D. Felix (#6539)
PIA HOYT, LLC
170 S. Main Street, Suite 1100
Salt Lake City, Utah 84101
Tel: (801) 350-9000
wfelix@piahoyt.com

*Attorney for the Plaintiffs*

# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DOUGLAS GOLDSMITH, an individual, GOLDSMITH PROPERTIES, LLC a Utah limited liability company<br><br>Plaintiffs,<br><br>vs.<br><br>KEVIN G. LONG, an individual; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK BLYTHEVILLE, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a Utah company; MARK MACHLIS, an individual; and GREEN IVY REALTY, INC., a Utah corporation,<br><br>Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS KEVIN G. LONG AND MILLCREEK COMMERCIAL PROPERTIES LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Case No. 2:24-cv-00499-HCN-DBP<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Dustin B. Pead |

Plaintiffs, Douglas Goldsmith and Goldsmith Properties, LLC (collectively "*Goldsmith*" or "*Plaintiffs*"), by and through their attorney of record, in accordance with F.R.C.P. 12 and 9, submit their Opposition to Defendants, Kevin G. Long's and Millcreek Commercial Properties, LLC's Motion to Dismiss First Amended Complaint and Supporting Memorandum ("*Motion*") (Dkt. #41).

1

## I. INTRODUCTION

Kevin Long ("***Long***"), founder and principal of Millcreek Commercial Properties, LLC ("***Millcreek***"), and an agent for and investor in Millrock Investment Fund 1, LLC ("***Millrock***") was introduced to Plaintiff Douglas Goldsmith by Mark Machlis ("***Machlis***"), a longtime friend, confidant and real estate agent for Goldsmith. Goldsmith did not know that Long was the architect and impresario of a complex Ponzi scheme in which investors were lured into commercial real estate transactions with the promise of highly profitable long-term leases with "dream tenants" when Long knew that the tenants lacked the financial wherewithal to perform on the inflated leases. Long insured that the scam would not be immediately apparent by paying sham "rent" to purchasers like Goldsmith for two or more years from the money invested. When those sham rents ceased, investors like Goldsmith, learned that there was no tenant or that the tenant was an empty shell without assets or viable operations.

During the roughly 180-day period between early 2021 and August 6, 2021, Long and Machlis met with Goldsmith and communicated with him over the telephone and through emails. Nearly all those communications involved both Long and Machlis. Long and Machlis persuaded Goldsmith to invest in a commercial property in Blytheville, Arkansas. Goldsmith was told by Long and Machlis that the Blytheville facility came with a dream tenant offering a long-term lease that would provide Goldsmith as a passive investor with a reliable, safe and secure income for many years. Long also told Goldsmith that the property would be improved to meet the needs of the tenant using money invested by additional TIC investors who would be obtained by Millcreek. Long did not tell Goldsmith that Machlis was a "development partner" for Millcreek giving him a substantial financial incentive to push Goldsmith into the transaction. Long also did not disclose that a million or more would be paid in kickbacks to the tenant HealthCare Solutions Holdings Inc. ("***HSH***") from the funds invested by Goldsmith.

2

There was never a viable tenant for the property. As of the time of the closing of the Blytheville transaction, Long knew there was no tenant, knew that the doctor he had promised would run the clinic had already been fired by HSH and he knew that there was no foreseeable replacement.

Long and his company Millcreek argue that the Complaint does not adequately specify their role in the fraud. This claim is premised on the assertion that the Complaint typically refers to misrepresentations made by the only two individual Defendants, Machlis and Long, or to misrepresentations made in the documents disseminated by Millcreek. This assertion is without merit. As alleged in the Amended Complaint both Long and Goldsmith ("Defendants") made all the principal misrepresentations or omitted to disclose those material facts that would have dissuaded Goldsmith from making his investment. At a minimum, Goldsmith has alleged adequate omissions by Long, and Millcreek through its agent Long, sufficient to support all of his fraud-based claims.

## II. ARGUMENT

**A. The Sale of Real Property Bundled With a Lease Arrangement Managed by Third Parties and "Guaranteeing" a Passive Long-Term Investment Return is a Security Under the Federal Securities Laws.**

Under the 1933 Securities Act a security includes "any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, [or] investment contract . . ." 15. U.S.C. § 77b(a)(1). The United States Supreme Court observed that the definition is broad enough to encompass "virtually anything that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

An "investment contract" was defined in *SEC v. W.J. Howey Co.*, as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." 328 U.S. 293, 298-99 (1946). Subsequent courts have emphasized that when deciding what constitutes a security "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). It is now well-established that the sale of real property when combined with promises related to long-term returns based on third-party leases are typically securities. *OMNI Brokerage, Inc. Argus Realty Investors, L.P. PASSCO Companies, LLC*, SEC No-Action Letter (Jan. 14, 2009). Although these schemes usually involve the sale of tenant-in-common interests, this feature is not essential. See generally, Note: Betting the Farm: the TIC Turf War and Why TICS Constitute Investment Contracts Under Federal Securities Laws, 1 WM. & Mary Bus. L. Rev. 451 (April, 2010). The sale of real property constitutes a security when bundled with a long-term often triple net lease under circumstances where the investor is promised a passive investment guaranteeing or insuring a safe return on the investment without significant involvement by the investor. *See, e.g., SEC v. Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 114917, *15 (D. Or., Dec. 9, 2009)

As alleged in Goldsmith's Amended Complaint, the Defendants disseminated marketing materials touting the passive structure of Millcreek's investments. "With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love." [Amended Complaint, ¶¶ 33-35 (Dkt. #5)]. Goldsmith was promised by Long and Machlis, that Goldsmith would receive monthly rent of $14,447.92 escalating to $17,094.77. He was promised that there was a dream tenant already in place providing revenue

4

that would support the lease. Goldsmith's reasonable expectation was that he would be a passive investor in the property profiting from the long-term lease he entered with Defendant Millrock Blytheville, LLC. In fact, he never received any "rent" payments and the long-term tenant purportedly generating revenue to cover the long-term lease never existed. Schemes like the Millcreek scheme have been found to involve the sale of securities. Indeed, these schemes frequently involve the payment of sham rents to cover up the fraud. *Sunwest*, 2009 U.S. Dist. LEXIS, at * 6 ("the practice of paying rent when the investment was failing was misleading to investors")

In *Oak Hill Mgmt. v. Edmund & Wheeler, Inc.,* the court, discussing the Rockwell fraud, a scheme nearly identical to the Millcreek scheme and involving several of the same individuals, found that at the motion to dismiss stage there was at least a question of fact as to whether "the facts alleged could show that the investment was expected to be passive." 2021 U.S. Dist. LEXIS 162584, at *28-29 (D.Vt., Mar. 16, 2022). "[W]hether a particular contract is an investment contract under federal securities law is a question of fact that is rarely appropriate on consideration of a motion to dismiss. Only when there are no reasonable allegations to support the existence of an investment contract may a court grant a motion to dismiss a security claim." *Crowley v. Montgomery Ward & Co*., 570 F.2d 875, 877 (10th Cir. 1975). Because the question of passivity is fact intensive "the question of whether or not the transaction constituted an investment contract is more appropriately addressed in a summary judgment motion." *Id.* Indeed, courts have denied motions for summary judgment where there was a dispute between the parties as to the level of control or passivity of the investor with respect to the investment. *See, e.g., San Francisco Residence Club, Inc. v. Amado,* 2010 U.S. Dist. LEXIS 55134, *14 (where there is a dispute of fact as to the level of plaintiff's involvement in management the determination of whether the

5

investments were "securities and subject to the registration requirements under the 1933 Act depends upon resolution of these disputed facts. The question is not, therefore, one that can be answered at the summary judgment phase. . .")

The essence of the fraud was Long's representation that there was a financially stable tenant in place who would guarantee the payment of the lease when in fact, Defendants knew the lessee and the supposed tenant had no assets and no ability to pay the above market rents promised. In this case, Long and Machlis lied about the existence of any HSH tenant – there was none. Contrary to Long's argument, there were collateral agreements. The closing included a long-term lease with Millrock Blytheville who in turn represented that they had a lease with HSH during the period of construction.[1] In addition, Long represented that the property would be managed by a Millcreek proxy.

Defendants counter that "there is no allegation or evidence that the lease agreement or Millrock Blytheville's management of the commercial property was essential" to the transaction. This statement is false. Goldsmith alleges that the property was marketed "as safe and reasonable based on a 20-year lease agreement with HealthCare Solutions Holdings Inc. ("HSH") that would return between 6% and 9% on the invested money." [Amended Complaint, at ¶ 4 (Dkt. #5)]. Defendants represented that the solid tenant provided "a safe and secure source of passive income." [*Id*., at ¶ 31.] Goldsmith was told by Long and Machlis that "HSH had already agreed

---

[1]The transaction was structured as the sale of the commercial property with a "ground lease" to Millrock Blytheville who in turn was to have a longer-term lease with HSH. The structure was required for the purchase to comply with the build-to-suit requirements of a 1031 exchange, i.e., the value of the property as improved would equal the value of the relinquished property for tax purposes. In fact, there was no real plan to improve the property, no tenant paying for the improvements and no lease with HSH. We do not know at this stage of the litigation whether HSH paid no rent or whether they made two or fewer rent payments to Millrock. We do know now that the shame rent payments were made by Millrock Investment Fund 1, LLC a factor evidencing the intermingling of funds among the entities manipulated by Millcreek.

6

to be the tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue." [*Id*., at ¶ 40.] Contrary to Defendants' contentions, the long-term lease was the most critical piece of the investment sold to Goldsmith. And that piece turned out to be a fiction created by Long and Machlis.

Defendants contend that there is no security when the investor has "managerial rights over the tenant." This has never been the law. In *Howey*, the wellspring of the definition of security, investors purchased land in Florida that was to be operated as orange groves. Investors were told that they could purchase real estate combined with a service contract with a company operating the orange grove. *SEC v. Howey Co*., 328 U.S. 344, 351 (1934) (finding that the sale of plots of land containing orange groves managed by others was the sale of a security). The Supreme Court was careful to note that although most of the investors contracted with the service provider offered by the seller, each purchaser "was free to make arrangements with other service companies." *Id*., at 295. Defendants make the same argument – that there is no security unless the purchaser is completely divested of management control – that was made by Justice Frankfurter in dissent and which has been rejected by the Supreme Court majority from 1946 to the present.

As Defendants acknowledge, the Tenth Circuit has rejected rigid tests of commonality and instead looks to the economic reality of the transaction. "Thus, the determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit." *Campbell v. Castle Stone Homes, Inc*., 2011 U.S. Dist. LEXIS 27266, *12 (D. Utah, March 15 2011) (*citing Berrios-Bones v. Nexidis,* LLC, 2007, U.S. Dist. LEXIS 80283 *5 (D. Utah, Oct. 30, 2007). Here, the investment was marketed by Long and Millcreek as entirely passive. The investor need not worry about managing the property, instead the investor could sit back passively with the secure expectation of continuous long-term returns on his investment.

7

[Amended Complaint at ¶¶ 32-35 (Dkt. #5)]. ("With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns…").

The case principally relied upon by Defendants, *DeMarco v. LaPay*, did not involve promises of a passive investment, did not include promises of continuous returns, and did not include any collateral agreement such as a long-term third-party lease with an alleged guarantee. Indeed, Judge Stewart in *Campbell v. Castle Stone Homes*, distinguished his earlier holding in *DeMarco* and found a common enterprise where property was sold with representations that the investment would "create wealth" that there would be a guaranteed client profit. Judge Stewart observed that *DeMarco* "was distinguishable from the present situation because the DeMarco plaintiffs were not told anything specific about expected profits. In the present action, plaintiffs were promised specific returns . . ." 2011 U.S. Dist. LEXIS 27266, * 13-14. At a minimum, at this early stage of the litigation the record has not been sufficiently developed for the Court to decide whether the Blytheville sale was the sale of a security under the Securities Act and the Securities and Exchange Act.

### B. Plaintiffs Have Plead Fraud with the Requisite Particularity.

There are but two individual Defendants in this action: Kevin Long and Mark Machlis. These Defendants, individually and jointly, made numerous material representations of fact to Goldsmith. The Amended Complaint alleges that Long and Machlis marketed the Blytheville property to Goldsmith telling him that: (1) HSH had already agreed to be the tenant; (2) that Dr. Sadeem Mahmood, an interventional cardiologist would be working in the facility; (3) that Goldsmith would receive regular rent from the tenant; (4) that additional TIC investors would be brought in to improve the property; (5) that Long and Machlis had conducted extensive due

diligence on the property and the tenant; and (6) that the lease payments would be guaranteed by a bond from Lloyds of London. [Amended Complaint, at ¶¶ 40-50, 57 (Dkt. #5)]. All these representations were made to Goldsmith when the property was marketed to him by Long and Machlis from early 2021. These representations were material and false. *See SEC v. Gann*, 565 F.3d 932, 937 (5th Cir. 2009) (A statement or omission is material if it is reasonably calculated to influence the decisions of an investor). Defendants Long and Machlis knew that Dr. Mahmoud had been fired, that there were no reasonable expectations that any HSH physicians would operate out of the facility. Goldsmith was also told that $300,000 of his money was used for architectural plans when, in fact, that money was used for kickbacks to HSH for participating in the fraud. [Amended Complaint, at ¶¶ 47-52 (Dkt. #5)].

More importantly, the core of the fraud alleged in this case is fraud by omission. No reasonable investor would purchase an investment knowing that immediately before his purchase the investment had been purchased by the seller for one quarter of the current asking price and that the excess funds were retained by the seller for kickbacks, finder fees, commissions and payouts to insiders. This is exactly what the Defendants did here. And this material information was withheld from and concealed by Long and Machlis.

The Complaint alleges that Long and Machlis did not tell Goldsmith that Blytheville was purchased for nearly two million less than the sales price to Goldsmith on the same day as the Goldsmith closing. [Amended Complaint, at ¶¶ 41, 57 (Dkt. #5)]. Goldsmith was not told: (1) that Dr. Mahmoud who was supposed to run the clinic had previously been fired; (2) that HSH was a shell entity with no assets and that one of its principals was barred by the SEC from participating or associating with anyone involved in the sale of investments; (3) that the "rent" to be paid to Goldsmith would be paid out of his own invested funds; (4) that part of the property

9

was leased by UPS and would not be part of the sale; (5) that Machlis was a "finder" or agent for Millcreek and was being paid a fee of roughly 6%; (6) that Machlis was not a real estate agent for Goldsmith; (7) that additional fees were paid out of the closing to Long and Colliers; (8) that HSH was a sham entity that had already defaulted on rent payments in other Millcreek investments; and (9) that there never was any cardiologist or indeed anyone from HSH who had ever worked at the Blytheville facility. [Amended Complaint, ¶¶ 33-38, 41-50, 57 (Dkt. #5)].

As Judge Campbell observed in the related Rockwell fraud case, omissions which can serve as the sole basis for both securities fraud and common law fraud claims cannot be provided with a specific place and time. "[I]t is unclear how Plaintiffs could have been more specific; because they are alleging that each Defendant failed to make certain disclosures [and] there is no practical way for Plaintiffs to detail the date or place of conversations that never occurred." *DiTucci v. Ashby*, 2019 U.S. Dist. LEXIS 106144 *13, (D. Utah June 24, 2019). Moreover, when "a claim sounding in fraud contains a hybrid of allegations, some of which satisfy the strictures of Rule 9(b) and some of which do not, an inquiring court may sustain the claim on the basis of those specific allegations that are properly pleaded." *Homes Dev. Corp. v. Edmund & Wheller, Inc.,* 2022 U.S. Dist. LEXIS 176825, *22 (D. N.H. September 29, 2022).

In addition, Long is liable for the misrepresentations contained in the marketing materials distributed by his company Millcreek. The United States Supreme Court held in *Lorenzo v. SEC* that a defendant violates 10(b) when they did not make direct misrepresentations but disseminated false information. The court expressly held that a defendant incurred liability when disseminating a false statement even when that statement was made by another. Long knew that Millcreek did not "vigorously vet every property that we offer" and that Millcreek did not sell only properties with tenants that would "thrive in any economic environment." To the contrary, Long knew that

10

HSH had no operating facility at Blytheville, that it was a shell entity with no assets and that Long and Millcreek were paying millions in kickbacks to HSH to keep it afloat to prop up the Millcreek Ponzi scheme.

### C. **Machlis and Green Ivy Acted with Scienter**

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). A plaintiff must allege facts which provide a basis to believe that defendant knew or was reckless in not knowing "that a statement was materially false or misleading" *North American Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009).

Long was the founder and principal of Millcreek. Millcreek structured the property deals involving HSH as a shell tenant. In his capacity as principal and agent of Millcreek, Long knew that Millcreek along with Millrock were paying millions in kickbacks, payoffs, commissions and undisclosed "finders fees."  It is reasonable to infer that Long knew that any investor, including Goldsmith, would want to know that a property sold for $2,829,478 had been purchased for $845,000 with the difference going to undisclosed payoffs. It is even more obvious that Long knew that Goldsmith would want to know that Machlis was an agent acting on behalf of the seller Millcreek. Thus, it was at a minimum grossly reckless for Long to represent that HSH was a tenant, that HSH was a stable tenant, that Dr. Mahmood both worked for HSH and was working at Blytheville, that HSH was financially solvent and could reliably guarantee the rent payments under the long-term lease, and that the Blytheville property was worth $2,825,478.81. These facts Long and Machlis intentionally withheld. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 325 (2007) (personal financial gain may weigh heavily in favor of a scienter inference).

11

**D. Plaintiffs Allege Facts Sufficient to Support their Negligence and Breach of Fiduciary Duty Claims.**

Defendants argue that Plaintiffs allege no affirmative misrepresentation supporting the claim that there was any duty to disclose omitted information. First, Plaintiffs have alleged numerous affirmative misrepresentations as detailed above. Second, Plaintiffs allege that Long held himself out as having superior skill, knowledge, training, and experience concerning all aspects of the transaction". [Amended Complaint at ¶¶ 96-100 (Dkt. #5)]. Long, acting as either a real estate agent or engaged in the sale of securities had an affirmative duty to disclose material information to a potential purchaser. A seller's agent owes the seller the fiduciary duty of full disclosure, which obligates the agent to tell the seller all material information which the agent learns about the buyer or about the transaction. Utah Admin. Code r. 162-6-2.15.1(c) Disclosure is required under Rule 10(b) when necessary to make statements made, in the light of the circumstances in which they were made, not misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011). Under the circumstances here, Plaintiffs have more than adequately plead facts supporting a duty to disclose.

**E. Plaintiffs Have Adequately Plead Unjust Enrichment.**

Defendants argue that Long could not have been unjustly enriched because the fee he received came from Millcreek and not from Goldsmith. Again, this introduces a factual question – whether Long was paid with monies from Goldsmith or from some other. The Amended Complaint alleges that Long was paid from the proceeds provided by Goldsmith in the Blytheville transaction. [Amended Complaint, at ¶¶ 110-112 (Dkt. #5)]. More importantly, the seller paying the commission was not an independent third-party it was Long and his company Millcreek acting on behalf of Colliers. Thus, the payor to Long was directly the purchaser, Goldsmith. That fact cannot be contested on a motion to dismiss and, therefore, Defendants' Motion to Dismiss this

12

claim should be denied. Moreover, Long cites no case law supporting the spurious assertion that a real estate agent is not unjustly enriched when receiving a commission for consummating a fraudulent transaction.[2]

### F. Plaintiffs Conspiracy Claim Is Supported by Allegations Asserting Material Misrepresentations and Omissions.

Defendants argue that Plaintiffs' conspiracy claim must be dismissed because Plaintiffs have failed to allege any underlying tort. For the reasons discussed above, Plaintiffs have plead facts supporting material misrepresentations and omissions. Those allegations support Plaintiffs' tort and securities claims which in turn satisfy the requirement that an allegation of conspiracy must include an allegation of "one or more unlawful overt acts." Defendants' Motion to Dismiss Plaintiffs' conspiracy claim must therefore be denied.

### G. Millcreek Is Vicariously Liable for the Acts of its Agent and Principal Long

A corporation acts only through individuals. The corporation is generally liable for acts by its agents committed within the agency relationship even when those acts are fraudulent. "[W]hen a salesperson lies to a customer to make a sale, the tortious conduct is within the scope of employment because it benefits the employer by increasing sales, even though it may violate the employer's policies." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). *See also* Restatement (Third) of Agency § 7.07 cmt. d (Am. Law Inst. 2006) ("[W]hen an employee's job duties include making statements to prospective customers to induce them to buy from the employer, intentional misrepresentations made by the employee are within the scope of employment unless circumstances establish that the employee has departed from it."). Courts that have considered the issue in the context of the sale of insurance products have routinely held insurance companies vicariously liable for the fraudulent

---

[2] Unless of course, that commission was paid by an innocent and independent third-party seller.

misrepresentations made by their agents. *See, e.g.*, *Weyand v. Union Central Life Ins. Co.*, No. 30-2013-00633423, 2016 Cal. App. Unpub. LEXIS 1422, 2016 WL 750433, at *7 (Cal. Ct. App. Feb. 26, 2016); *Pan-American Life Ins. Co. v. Roethke*, 30 S.W.3d 128, 132-33 (Ky. 2000); *Chicago Title Ins. Co. v. Washington State Office of Ins. Comm'r*, 178 Wn.2d 120, 309 P.3d 372, 381-83 (Wash. 2013). *See also Cook v. John Hancock Life Ins. Co.*, No. 7:12-cv-00455, 2015 U.S. Dist. LEXIS 4318, 2015 WL 178108, at *9 (W.D. Va. Jan. 14, 2015) (denying a motion to dismiss because the misrepresentations about a life insurance policy "were arguably within the scope of [the agent's] actual or apparent authority").

### H. **Even if the Court Were to Dismiss One or More Claims, Dismissal Should Be without Prejudice.**

Defendants ask the Court to dismiss Plaintiffs' claims with prejudice. The request is improper on a motion to dismiss. Absent exceptional circumstances any dismissal under Rule 12(b)(6) must be without prejudice. Plaintiffs should be given the opportunity to seek leave to amend to correct any putative defects in the pleadings. Dismissal of a claim with prejudice is a harsh remedy. "As a general matter, a party should be granted an opportunity to amend his claims prior to a dismissal with prejudice. Indeed, leave to amend is usually permitted if a pleader fails to plead fraud or mistake with sufficient particularity. Dismissal with prejudice is warranted only when a court determines that the allegation of other facts could not possibly cure the deficiency or would be futile." *ReVest, LLC v. Long (In re Long)*, 2010 Bankr. LEXIS 1782, *18 (internal citations omitted).

///

///

### III.  CONCLUSION

For the above reasons, Defendants, Kevin G. Long's and Millcreek Commercial Properties, LLC's Motion to Dismiss First Amended Complaint and Supporting Memorandum, should be denied.[3]

DATED: November 19, 2024          PIA HOYT, LLC

                                  */s/ Wesley Felix*
                                  Wesley Felix
                                  Attorney for Plaintiffs

---

[3] Plaintiffs do not contest the dismissal of the claim for sale of an unregistered security as it does not now appear that plaintiffs can plead additional facts supporting the tolling of the relevant one year statute of limitations applicable to Section 12(a)(1) of the Securities Act.

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2024, I filed PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS KEVIN G. LONG AND MILLCREEK COMMERCIAL PROPERTIES LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT using the Court's electronic filing system, which will send notice of such filing to all counsel of record.

PIA HOYT LLC


By: *Michelle Lund*
      Paralegal