Wes Felix (#6539)
**NELSON CHRISTENSEN**
**HOLLINGWORTH & WILLIAMS**
68 S. Main Street, 6th Floor
Salt Lake City, UT 84101
Telephone: (801) 531-8400
Facsimile: (801) 363-3614
wes@nchwlaw.com

*Attorney for the Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DOUGLAS GOLDSMITH, an individual, GOLDSMITH PROPERTIES, LLC a Utah limited liability company<br><br>Plaintiffs,<br><br>vs.<br><br>KEVIN G. LONG, an individual; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK BLYTHEVILLE, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a Utah company; MARK MACHLIS, an individual; BRENT SMITH, and individual, and GREEN IVY REALTY, INC., a Utah corporation,<br><br>Defendants. | **SECOND AMENDED COMPLAINT**<br><br>**[JURY DEMAND]**<br><br><br>Case No. 2:24-cv-00499-AMA-CMR |

Plaintiffs Douglas Goldsmith and Goldsmith Properties, LLC (collectively "Goldsmith")

by and through undersigned counsel, complain against Defendants Kevin Long ("Long");

Millcreek Commercial Properties, LLC ("Millcreek Commercial"); Millrock Blytheville, LLC

("Millrock Blytheville"); Millrock Investment Fund 1, LLC ("Millrock"); Colliers International

("Colliers"); Mark Machlis ("Machlis"); Brent Smith ("Smith") and Green Ivy Realty, Inc.

("Green Ivy"), as follows:

## INTRODUCTION AND BACKGROUND

1.      Defendants conspired with one another and with other individuals to engage in a

nation-wide scheme to defraud Goldsmith and others by inducing them to invest in tenant-in-

common ("TIC") interests in commercial properties bundled with sham long-term leases (the

"Colliers/Millcreek Scheme"). The leases were represented to be triple net, or absolute net and

purchasers were assured that they would have no management responsibility.  The investment

was to be completely passive. The properties were sold at three or more times the actual value of

the underlying real estate. The inflated price was justified by the return on investment through

guaranteed long-term leases.  Defendants knew the lessors were shell entities with no substantive

assets.  Defendants knew there was no economic basis for the lease terms and that there was no

reason to believe that the lessor shell entities would be able to perform on the leases. This

information was hidden from purchasers. Instead, Defendants told purchasers that they had

obtained "dream tenants" whose success was assured.  Defendants represented that they had

performed thorough due diligence and that a return of 6.5 to 9 percent was guaranteed. Either

Long, Machlis and Smith performed little or no due diligence, or they knew the tenant in this

case was insolvent and could not possibly perform on the lease.  In either case, they knowingly

lied to Goldsmith.

2.      In addition, Defendants paid the first year or more in "rents" from investor

money. Without using investor money to pay "rents" to new investors, the Colliers/Millcreek

Scheme would have immediately collapsed and the fraud would have been revealed. In some instances, Defendants lent money to shell entities such as HealthCare Solutions Holdings Inc. ("HSH") so that HSH could appear viable but again only through using investor money to prop up the scheme.

3.      Typically, leases were executed and guaranteed by entities known to the Defendants to be incapable of performing under the terms of the leases. In addition, Defendants falsely represented that the leases were supported by a bond from Lloyds of London.

4.      In this case, Goldsmith purchased what he was told would be a TIC interest to be bundled with additional investors in a commercial property from Blytheville, Arkansas (the "Blytheville Property"). Goldsmith paid $2,829,478.  The purchase price was marketed as "investment grade" and safe and secure based upon a 20-year lease agreement with HSH that would return between 6% and 9% on the invested money. The 20-year lease included options to extend the period of the lease to 100 years.

5.      The lease also ceded complete control of the management and development of the Blytheville Property to Millrock Blytheville. Goldsmith relied on representations by Long and Smith in early 2021 that Goldsmith would have no maintenance or management responsibility, that the development of the Blytheville Property was to be managed entirely by Millrock Blytheville, and that funds would be obtained from additional TIC investors to finance approximately $8 to $9 million in improvements to the Blytheville Property. Pursuant to the lease, these improvements were owned by Millrock Blytheville and could be sold to TIC investors to obtain additional financing without Goldsmith's consent.

6.      In fact, the Blytheville Property was worth less than one third of the value represented by Defendants. There was no real tenant. Millrock made no investment in the development of the Blytheville Property. Millrock made a one-million-dollar kickback payment to HSH, and the entity, after making two months of rent payments, disappeared. Unknown to Goldsmith, American Medical Management ("AMM"), a shell company working with HSH and Millcreek Commercial, purchased the Blytheville Property for $845,000. Immediately thereafter, AMM sold the Blytheville Property to Millrock for $1,825,000.  Defendants then sold the Blytheville Property together with a long term guaranteed lease to Goldsmith Properties for $2,828,478.  Defendants told Goldsmith the purchase price was reasonable based upon the terms of the included lease. Without the lease, the "dream tenant" and Millrock Blytheville's management and development plan, Goldsmith would not have purchased the Blytheville Property.

7.      Defendants knew that in fact the lease was worthless and as a result, the Blytheville Property was worth at most the $845,000 that was paid for it the same day it was sold to Goldsmith.  As Goldsmith later discovered, Smith, Long and Machlis never visited or inspected the Blytheville Property.  They never spoke to the original owner of the facility prior to Goldsmith's TIC purchase. The original owner was an ophthalmologist. She stated that after she sold the building, she kept working there waiting for someone to tell her if she had to leave or pay rent.  There were no preparations for construction. No trailers were ever placed on site from which doctors could have worked temporarily – as was represented by Long and Machlis in early 2021. Indeed, as of three years after Goldsmith's purchase, no HSH doctors ever worked at the

facility. The ophthalmologist continued to work at Blytheville rent free until Goldsmith discovered the fraud and cover up.

8.      Defendants made monthly "rent" payments to Goldsmith of $14,447.92 during the "construction period" described in the lease.  The rent payments were secretly made by Millrock from money invested by Goldsmith.  The payments lasted twenty-four (24) months, and then it became clear there was no real entity behind the lease payments or the putative surgical center. As Goldsmith later discovered, Defendants had never spoken to the physicians on site at the facility. Those physicians never paid rent.  The putative new tenants, including a Dr. Mahmoud whom Defendants represented would operate the improved facility, never worked at the Blytheville Property. In fact, no HSH or SARC physicians ever worked at the Blytheville Property. The sham rent payments soon ceased. HSH made only two lease payments to Millrock under its sublease.

9.       These facts were withheld from Goldsmith by Long and Machlis. Dr. Mahmood later told Goldsmith that he never planned to work at the Blytheville Property and could not have worked there. Millrock ceased making any payments on or before August 2023.  The shell entity HSH declared bankruptcy on September 15, 2023. As of August 2023, Defendants had taken more than a million of Goldsmith's money.  No development occurred. No plans for an actual operating facility were ever made.  Goldsmith was told by Long that Millrock Blytheville had no assets and that no rent was going to be paid.

10.     On information and belief, the Blytheville Property is currently worth roughly $507,000.  The two-million-dollar difference between the actual value of the Blytheville

Property and the purchase price paid by Goldsmith was pocketed by Defendants in undisclosed commissions and referral fees or simply taken as undisclosed "profits."

## PARTIES

11.    Plaintiff Douglas Goldsmith is an individual residing in Salt Lake County, Utah.

12.    Plaintiff Goldsmith Properties, LLC is a Utah limited liability company and is an entity created for the purpose of purchasing the Blytheville Property.

13.    Defendant Kevin G. Long is an individual residing in Utah.

14.    Long was a co-founder, Senior Vice President and Executive Vice President of Millcreek Commercial Properties, LLC and Colliers International Utah division, as shown in his email signature from communications and excerpt from his personal LinkedIn page:

**Kevin G. Long**

Senior Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com







**Kevin G. Long**

Executive Vice President
Direct +1 801 947-8324 | Mobile +1 801 400-2080
Main +1 801 610-1300 | Fax +1 801 947-8301
kevin.long@colliers.com

**Colliers International – Utah | Millcreek Commercial**
2100 Pleasant Grove Blvd | Suite 200
Pleasant Grove, UT 84062 | United States

www.millcreekcommercial.com
www.colliers.com



Kevin Long
President, CEO and Co-Founder of Millcreek Commercial

## Experience



President of Millcreek Commercial with Colliers International | Utah
Millcreek Commercial
Jun 2017 - Present · 6 yrs 1 mo
Salt Lake City, UT

15.     Long is the managing agent for Millrock and Millrock Blytheville. Long is an owner of Millrock.  Long's roles in the entities are interwoven and mostly indistinguishable. Long markets the TIC investments sold by Millrock through Colliers and Millcreek Commercial.

16.     At all relevant times, Long was an employee and agent for Colliers. Long was paid commissions of up to 6% by Colliers as well as commissions from Millrock to Millcreek Commercial of approximately 2%. These commissions were not disclosed to Goldsmith.

17.     Defendant Millcreek Commercial Properties, LLC is a Utah limited liability company with its principal place of business in Salt Lake County, Utah. Millcreek Commercial is the exclusive marketing arm of Millrock.  Millcreek Commercial and Millrock share owners and

managers and in practice were often indistinguishable.  Smith was an owner and manager of both Millcreek Commercial and Millrock as was Long.

18.    Defendant Millrock Blytheville, LLC is a Utah limited liability company.

19.    Defendant Millrock Investment Fund 1, LLC is a Utah limited liability company.

20.    Millrock Investment Fund 1, LLC is a small family fund that markets properties through Millcreek Commercial Properties, LLC.  Long and Smith are owners of Millrock.

21.    Thomas Smith is a principal and agent of Millrock Investment Fund 1, LLC. Thomas Smith is Smith's father.

22.    Defendant Colliers International is an international real estate and investment services company.  Colliers maintains at least four offices in Utah.

23.    At all times relevant, employees and agents of Colliers working through and with Millcreek Commercial sold the Blytheville investment to Goldsmith.

24.    Defendant Mark Machlis is an individual residing in Salt Lake County, Utah.

25.    Machlis is the registered agent of Green Ivy Realty and a development partner of Millrock. Machlis deceived Goldsmith inducing him to believe that he was acting as Goldsmith's agent in the Blytheville Property transaction when in fact Machlis was secretly a development partner and agent for Millcreek Commercial and Millrock.

26.    On information and belief, Machlis worked as an agent with Millcreek Commercial in connection with the sale of the Blytheville Property.

27.    Defendant Green Ivy Realty, Inc is a Utah company owned and operated by Machlis.

28.    Defendant Brent Smith is an individual residing in Utah.

29.     Smith was an owner and manager of Millcreek Commercial and Millrock.

30.     Smith was the investor relations vice president or investor relations partner for both Millcreek Commercial and Millrock.  Smith has stated that he was directly involved in and participated in the creation of the marketing materials for Millcreek Commercial, and that he supervised and conducted oversight of the marketing materials to ensure their accuracy.

31.     At both Millrock and Millcreek Commercial, Smith disseminated the false and misleading marketing materials described in the Complaint. These materials were principally disseminated through the internet and on the Millcreek Commercial website. Long and Machlis also disseminated the Millcreek marketing materials. As detailed below, most of the representations in the Millcreek Commercial marketing materials which were relied upon by Goldsmith in deciding to invest were demonstrably false.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 over the claims arising under federal law including 15 U.S.C. § 78j(b), 15 U.S.C. § 78t(a) and 15 U.S.C. § 77l.

33.     The Court has supplemental jurisdiction over the state law claims asserted pursuant to 28 U.S.C. §1367.

34.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 78aa.

35.     In connection with the conduct alleged in this Complaint the Defendants availed themselves of the means of interstate commerce including the internet, telephone and mail.

## THE SCHEME

36.     Millcreek Commercial actively markets tenant-in-common ("TIC') interests in commercial real estate as safe and secure investments offering a guaranteed source of long-term income.  Frequently, Millcreek Commercial pitched the TIC investments to potential buyers in need of a way to utilize the tax benefits of an exchange under IRS Section 1031. Purchasers in a 1031 exchange are ideal marks for unscrupulous sellers as they are under strict time constraints when identifying and buying the exchange property.

37.     Millcreek Commercial was co-founded and run by Kevin Long of Colliers and acted in partnership with Colliers in marketing and selling the TIC securities investments. Millcreek Commercial marketed its properties over the internet, through mail and using other means of interstate communication. Millcreek Commercial was the exclusive marketing arm of Millrock.  Brent Smith owned and worked for both Millrock and Millcreek Commercial interchangeably.

38.     Millcreek Commercial, along with its co-conspirators including Millrock, would purchase commercial properties and then enter into long-term lease agreements at highly inflated prices. Millcreek Commercial would then market the properties to potential investors with long-term leases representing that the leases provided a safe and secure source of passive income. Smith and Long disseminated the marketing materials mainly through Millcreek Commercial's website but also through mailed material, investment "stacks" and direct representations to potential investors.

39.     The lease terms offered by Defendants were in fact so extravagant given the undisclosed purchase prices of the investment property that it was clear to Defendants from the

outset that the lease terms could not be met. To hide the scheme, Defendants would pay the first year to two years of rent to investors from invested money, thereby postponing the collapse of the scheme while Millcreek Commercial continued to defraud new investors. Smith and Long, because they were paying rents through Millrock, and because they conspired with HSH and its principals, knew that the tenants could not possibly perform on their leases.

40.    Millcreek Commercial stated that investors could, "[r]est assured that our portfolio is rock solid. We rigorously vet every property that we offer." They represented that they sold only properties with tenants who can "thrive in any economic environment," as shown in this excerpt from Millcreek Commercial's website, on a page called "1031 Exchange":

## Exchanging Hassle For Happiness.

Tenant issues, fixing toilets, and painting walls is hard work. Have you ever considered owning quality commercial real estate? With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love. Our co-ownership model makes it possible for any investor to utilize and 1031 exchange to buy into high quality commercial real estate. Rest assured that our portfolio is rock solid. We rigorously vet every property that we offer.

41.    In fact, Millcreek Commercial's leases were often with shell entities without real assets or ability to pay the inflated rents.

42.    One "dream tenant" working with Millcreek Commercial was HSH. Millcreek Commercial and its co-conspirators represented that HSH was a publicly-traded medical company focused on providing clinicians with "state of the art diagnostic and therapeutic tools," as shown in this excerpt from the Marketing Materials:

11

## Backed By Strength

Healthcare Solutions Holdings, Inc. "HSH" is a publicly-traded medical service and device company focused on providing clinicians with state-of-the-art diagnostic and therapeutic tools. HSH's mission is to provide clinicians with broader access to the most advanced technologies in the Healthcare Industry. Technology proliferation drives progressive methods of testing patients, leading to superior patient outcomes.

43.     Millcreek Commercial stated that HSH "will capture revenue and margins that have historically been 'lost' resulting in "significantly enhanced operating margins."

44.     In fact, HSH was a shell company without any substantive operations or assets. HSH is a wholly owned subsidiary of Health Care Solutions Management Group, Inc. ("HSMG"). HSMG was forced into involuntary bankruptcy in September of 2023. Delaware Bankruptcy Court, Case No. 1:23-bk-11458.

45.     Joshua Constantin, the Head of Commercial Real Estate for HSH, was "indefinitely barred by the United States Securities and Exchange Commission from acting as a broker or investment advisor, or from associating with any broker, dealer, investment advisor, municipal securities dealer, municipal advisor, or transfer agent" in Case No. 1:11-cv-04642 in the United States District Court for the Southern District of New York.

46.     Smith and Long worked directly with Constantin in the Blytheville transaction, siphoning a million dollars from Goldsmith's invested money to Constantin. Smith and Long claim that they did not do background research on Constantin because HSH was a publicly traded company. But in fact, HSH was not a public company at the time of the relevant transactions, and only became a public company through a "reverse merger" avoiding most of the disclosure requirements imposed on new public companies. In fact, a simple internet search would have disclosed to Smith and Long Constantin's nefarious past. It is just as likely that Smith and Long were aware of Constantin's criminal history.

12

## THE BLYTHEVILLE TRANSACTION

47.     In early 2021, HSH with the cooperation of Millcreek Commercial and Millrock, purchased the Blytheville Property for $845,000.  HSH formed an entity, AMM, to make the purchase. The Blytheville Property was immediately resold to Millrock Blytheville, a wholly owned subsidiary of Millrock for $1,825,000.

48.     The Blytheville Property was marketed by Millcreek Commercial, Millrock, Long, and Machlis to Goldsmith. Goldsmith was told that HSH had already agreed to be the tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue. Goldsmith was told that there would be a four month to one-year construction and development period during which additional TIC investors would invest and Millrock would manage and develop the Blytheville Property. The leases were structured to allow Defendants to market and sell partial interests to new investors to finance the development of the project. These sales of partial interests Machlis and Long represented that the development was already in progress in February 2021.  These representations were false.

49.     At a meeting on December 28, 2020, attended by Machlis and Long via Zoom, Long told Goldsmith that during the construction period Goldsmith would receive rent of $14,447.92 per month. Long further represented that a Dr. Mahmood and other physicians from HSH would work from trailers on site during the expansion and development. Goldsmith was promised a 7.25% return on his investment of $2,825,478.81. After the construction period, the rent was to increase to $17,094.77. Goldsmith was also told that his investment was structured like a TIC investment, in part so that his purchase would comply with 1031 exchange regulations, and that new investors would be brought in and that their investment money would

be used to improve the Blytheville Property. Long told Goldsmith that Defendants planned on making approximately $8,000,000 to $9,000,000 in improvements.  Long stated that these arrangements had already been made and would be in place if Goldsmith purchased the Blytheville Property.

50.    The TIC structure was retained through a long-term ground lease with Millrock which gave Millrock the right, without the consent of Goldsmith, to market and sell partial interests in the lease connected to the sublease with HSH. In effect, Millrock was the manager and developer of the Blytheville Property with the sole right and obligation to maintain and improve it.

51.    Machlis agreed with and did not contest Long's assertions.  Goldsmith later discovered that Defendants had made no such arrangements, that no doctors were ever contacted or agreed to work at the Blytheville Property, and that there were no real plans for development. Machlis and Long knew that the contrary representations made to Goldsmith were false when made.

52.    Long also told Goldsmith that TIC investors were already lined up for the Blytheville Property including a man named Gabor Koltai. Long told Goldsmith that Koltai was ready to invest one to two million dollars in the Blytheville Property.  Goldsmith later spoke with Koltai and discovered that Defendants had never spoken to him about investing in the Blytheville Property.

53.    Long told Goldsmith, and Machlis affirmed, that the Blytheville Property would be subject to a triple net lease and that Goldsmith would have no maintenance or management responsibilities. Long told Goldsmith his investment would be completely passive. Millrock and

HSH would be responsible for maintenance, management, taxes and any other expenses. Goldsmith only needed to cash his monthly rent check. Millrock and HSH would have complete control over the management and development of the Blytheville Property. In short, the profitability of Goldsmith's investment would be solely based on the efforts of Millrock and HSH. If Millrock and HSH performed as represented, Goldsmith would receive a guaranteed return of 6 to 7.25 percent.

54.     Goldsmith was not told that HSH purchased the Blytheville Property and then resold it the same day to Millrock with HSH and Joshua Constantin taking a million dollars out of the deal. Smith, Long and Machlis intentionally withheld this material information from Goldsmith.

55.     Goldsmith was not told that HSH agreed to then lease the Blytheville Property back from Millrock. Goldsmith was not told that Dr. Mahmood had worked for HSH but had been fired before the Blytheville Property was sold to Goldsmith and that Dr. Mahmood had never worked or had even been approached about working at the Blytheville facility. These misrepresentations and omissions were material to Goldsmith and the representations made by Smith, Long and Machlis were made misleading because of the withheld information.

56.     Goldsmith was also not told that the "rent" he received for two years was paid out of his own invested money. Goldsmith was not told that there was no tenant paying rent.

57.     Goldsmith was also told that part of the Blytheville Property was leased by UPS and that the leased portion of the Blytheville Property was part of the sale.  It was not. Goldsmith was originally told by Long and Machlis in early 2021, that the Blytheville Property would

encompass 13.6 acres including a UPS facility.  The final transaction included on 3.6 acres and excluded the UPS facility.

58.    Goldsmith met again with Long and Machlis on January 14, 2021, at 8 Settlers restaurant. Long again represented that Goldsmith would be the first of several TIC investors. Long also stated that as the first TIC investor Goldsmith would get an enhanced rent percentage. Long told Goldsmith that after new investment money of approximately eight million was injected into the development and build out of the Blytheville Property, Goldsmith would own a roughly twenty-five percent TIC interest in the project. Long and Machlis represented that HSH physicians would be onsite at the time of closing.  Long and Machlis represented that thorough due diligence had been done on the development partner and on the tenant. Long represented that the initial rent would be guaranteed by a bond from Lloyd's of London.  None of these representations were true.

59.    At the time of the marketing meetings with Long and Machlis, Goldsmith was provided by Smith with a Blytheville "Investment Agreement."  This document detailed the terms as represented by Long, Machlis and Smith of the investment in the Blytheville Property. The representations made to Goldsmith included the following: 1) the deal was to be structured as a TIC investment in which Goldsmith would own, after development, approximately 28% of the total investment; 2) Millrock had coordinated the execution of a long-term lease bringing increased value to the Blytheville Property; Millrock had negotiated a Development Agreement to remodel the existing surgery center; and 3) total investment in the project would be roughly $9,981,545.

60.    Goldsmith met again at Colliers' office in Cottonwood Heights in early March. Long and Machlis repeated their misrepresentations.  They emphasized that they had thoroughly vetted the tenant and the agreements with physicians and that the project was sure to succeed because the tenant was a leader in the surgical center space with a track record of innovation and profitability. These statements were false.

61.    At closing on August 6, 2021, Goldsmith signed a Purchase and Sale Agreement ("PSA") and a long-term lease (the "Lease") with Millrock Blytheville.  The agreements were structured as proportionate/partial investment contracts.  Goldsmith was given a twenty-year lease agreement with Millrock Blytheville, LLC with options to extend to one hundred years. Millrock obtained the right to maintain and develop the Blytheville Property through sales of partial interests to new investors. The lease provided for rent of $14,447.92 during a construction period of up to two years then escalating to $17,094.77.

62.    The Lease noted that the Tenant (Millrock) would construct improvements on the Blytheville Property and that all subsequent improvements would be the sole obligation of Millrock subject to the Lease Agreement.  Millrock would have sole control of the development and disposal of the development and the developed property. The Lease expressly stated that Millrock is solely entitled at its sole cost and expense "to make any changes, additions, improvements or repairs to the Leased Premises  . . . without Landlord's (Goldsmith's) prior consent . . ."  Millrock was also provided with the sole right to "solicit, invest, borrow and encumber its leasehold interest in the Property."

63.    The Lease reflected the completely passive nature of the investment as sold to Goldsmith.  The Lease states that "payment of Rent hereunder shall be absolutely net to the

Landlord." Millrock retains the sole right and obligation to maintain, manage and operate all aspects of the Blytheville Property and Goldsmith is "not required to perform any service for the improvement or repair" of the Blytheville Property.

64.     The Lease was expressly contingent upon the provision by Millrock of the Blytheville TIC operating agreement. The parties to the Lease "agree and accept the Membership Interests issued pursuant to the Conversion Right subject to the terms and conditions of the Operating Agreement." The referenced membership interests are the TIC interests to be sold by Millrock for the benefit of the Blytheville Property.

65.     The PSA bound Goldsmith to the TIC development arrangement. The PSA was expressly contingent on Goldsmith and Millrock "entering into a 100-year lease of the Property . . . which shall expressly permit [Millrock] to further develop the Property . . . and to assign fractional interests in the Lease to subsequent investors. . ."

66.     The PSA was also "expressly contingent upon [Millrock] and [HSH] executing" a long-term lease. The combined agreements gave Millrock and HSH sole control of the profitability of the Blytheville investment. The parties understood that the investment was more an investment in the surgery center operation and lease arrangement than it was in the Blytheville Property. As the PSA stated, the parties "acknowledge and agree that the execution and delivery of the Lease is a material inducement to Buyer's purchase of the Property, and that Buyer would not be willing to purchase all or any part of the Property from Seller, or enter into this Agreement, without Seller's express agreement to the terms and conditions of the Lease."

67.     In reality, Millrock Blytheville had no assets other than Goldsmith's invested money minus an undisclosed amount of money siphoned off by Defendants as fees, commissions

and profits. Millrock made no effort to develop the Blytheville Property. Millrock Blytheville was woefully undercapitalized and entirely dependent upon intermingled funds from Millrock Investment Fund 1. For two years after the closing, Smith and Millrock, along with Long and Machlis, lied to Goldsmith about their intentions with the Blytheville Property and supported the deception by having Millrock pay sham rents to Goldsmith out of his own invested money.

68.    HSH filed for bankruptcy less than two years after the closing.

69.    Goldsmith was not told that Machlis worked as an agent for Millcreek Commercial. Machlis received a 5.5% brokerage fee. This was not disclosed to Goldsmith until after the closing. Similarly, Goldsmith was not told that Long and Colliers would receive at least 2% as an additional agents' selling fee. After the fraud was discovered, Machlis admitted he was an undisclosed "development partner" of Millrock.

70.    Goldsmith was not told by Defendants that HSH and its subsidiaries had already defaulted on lease payments in other properties.

71.    Goldsmith was not told that all "rent" from tenants ceased by December of 2021.

72.    To conceal the fraud, Goldsmith was paid "rent" by Millrock Blytheville for almost two years. He was later told that Millrock Blytheville had no more funds, i.e., Goldsmith's funds. He then learned there was no cardiologist working at Blytheville, that there was no rent being paid to Millrock Blytheville and no executed lease.

73.    In addition, Millrock Blytheville and Millrock, claimed to have used over $300,000 of Goldsmith's money for "architectural plans." On information and belief, that money was stolen by Defendants. No plans have ever been provided.

74.    Smith represented to Long that Millrock had disbursed funds for the development of the Blytheville Property and provided Long with profit and loss reports reflecting expenses incurred.  On information and belief, all of Smith's representations were false and no money was spent developing the Blytheville Property.

75.    Goldsmith lost approximately two million dollars on the Blytheville investment.

### FIRST CAUSE OF ACTION
**(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder Against All Defendants)**

76.    By this reference, the foregoing allegations are realleged and incorporated herein.

77.    Investment in the Blytheville Property bundled with the guaranteed 20-year lease was a security as defined in 15 U.S. Code § 77b (a)(1) in that it involved investment in a common enterprise with the success of the venture dependent primarily upon the efforts of others, namely, Millrock Blytheville. the HSH Parties as tenants, guarantor, and affiliated entities.

78.    Defendants made untrue statements of material fact and omitted material facts necessary to make the statements not misleading, as alleged above, in violation of Rule 10b-5.

79.    Defendants Long and Smith disseminated false and misleading marketing materials which were relied upon by Goldsmith to induce his purchase of the Blytheville Property.  In so doing, Long, Smith and their entities employed a "device, scheme, or artifice to defraud." In addition, Long, Smith and Machlis engaged in an "act, practice, or course of business" that "operates. . .as a fraud or deceit." 17 C.F.R. sec. 240. 10b-5.

80.    The material misrepresentations and omissions and deceptive acts and schemes were made in connection with the offer to sell a security.

81.    Such material misrepresentations and omissions include, in addition to those previously alleged and incorporated herein:

    a.    That Goldsmith would receive a return of roughly 7.25% over the initial 20-year lease term;

    b.    That the tenant was a "dream tenant;"

    c.    That the guarantor was a solvent company;

    d.    That the initial purchase of the Blytheville Property was nearly two million less than the sales price to Goldsmith and that the second sale of the Blytheville Property for a million more occurred on the same day as Goldsmith's closing;

    e.    That this was a Lloyd's of London-backed bond in place in case of tenant and guarantor default; and

    f.    That Millcreek Commercial's TIC offerings did not constitute securities, and federal and state laws regulating the sale of securities did not apply.

82.    Defendants all made the material misrepresentations and omissions either through verbal or written correspondence with Plaintiffs or through Marketing Materials.

83.    Long made each of the above misrepresentations at meetings with Goldsmith at the end of 2020 and in early 2021.

84.    Machlis made each of the above misrepresentations to Goldsmith at the end of 2020 and in early 2021.

85.    Defendants' material misrepresentation and omissions were made through the means or instruments of communication in interstate commerce or the mails— including

telephone lines, the internet, email transmissions over the internet, and the United States Postal Service.

86.     Defendants acted knowingly in making material misrepresentations and omissions or should have known but acted with reckless disregard for the truth.

87.     Plaintiffs justifiably relied on the foregoing misrepresentations and omissions.

88.     Goldsmith suffered substantial injury because of Defendants' misrepresentations and omissions in an amount to be proven at trial.

<u>SECOND CAUSE OF ACTION</u>
**(Common Law Fraud against Long, Machlis, Smith, Millcreek Commercial, Millrock, and Colliers)**

89.     By this reference, the foregoing allegations are realleged and incorporated herein.

90.     Defendants made false statements about material facts regarding the Blytheville Property, including the representations within the Marketing Materials and the representations made to the Plaintiffs directly by Long and Machlis.

91.     Defendants made the statements knowing that they were false.

92.     Alternatively, Defendants made the statements recklessly and without regard for their truth.

93.     Defendants intended that Plaintiffs would rely on the statements.

94.     Plaintiffs reasonably relied on the statements by investing in the Blytheville Property.

95.     As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

96.     Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

### THIRD CAUSE OF ACTION
**(Negligent Misrepresentation Against Long, Machlis, Smith, Millrock, Millcreek Commercial, and Colliers International)**

97.     By this reference, the foregoing allegations are realleged and incorporated herein.

98.     Defendants had a duty to determine and disclose fully and fairly all facts that materially affected or related to the condition of the Blytheville Property, the viability of the investment, and the legitimacy of the tenant and corporate guarantor.

99.     Defendants made false representations to Plaintiffs as detailed above.

100.    Defendants owed a duty of reasonable care to Plaintiffs independent of any contractual obligation.

101.    Defendants knew such representations were false or were negligent in making such representations.

102.    Defendants were negligent in investigating the tenant and the corporate guarantor.

103.    Defendants knew or should have known the misrepresentations were false.

104.    The Defendants made the misrepresentations to induce Plaintiffs to purchase the Blytheville Property for a grossly inflated price.

105.    The above misrepresentations and omissions were material.

106.    Plaintiffs would not have invested in the Blytheville Property had they known the true facts.

107.    Plaintiffs justifiably relied on the foregoing misrepresentations.

108.    As a result of Defendants' negligence, Plaintiffs have been damaged in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Machlis and Green Ivy)

109.    By this reference, the foregoing allegations are realleged and incorporated herein.

110.    Defendants had or held themselves out as having superior skill, knowledge, training, and experience concerning all aspects of the transactions by which Plaintiffs invested in the Blytheville Property.

111.    Machlis had been Goldsmith's realtor for years and in several transactions. Goldsmith was led to believe that Machlis was Goldsmith's realtor in the Blytheville transaction. This impression was implied so that Goldsmith would rely upon Machlis' expertise and experience in protecting Godlsmith's interest in the transaction.  Machlis admitted only two years later that he was secretly a development partner of Millrock.

112.    Defendants expected that Plaintiffs would put trust and confidence in Defendants and affirmatively invited and encouraged Plaintiff to rely on their judgment and skill regarding their investment in the Blytheville Property.

113.    The investment structure and IRS rules relating to 1031 exchanges made Plaintiffs the weaker parties with unique vulnerabilities, including, inter alia, Plaintiffs' age, experience, abilities, and disabilities, and the fact that Plaintiffs were prohibited from actively managing their investment.

114.    Plaintiffs' unique vulnerabilities put them in an unequal bargaining position with respect to Defendants.

115.    Defendants owed Plaintiffs fiduciary duties of utmost honesty, loyalty, and care.

116.   Plaintiffs reposed trust and confidence in Defendants to advise, counsel, and protect Plaintiffs.

117.   Defendants accepted that trust and confidence from Plaintiffs.

118.   Plaintiffs depended on Defendants to do their due diligence into the legitimacy of the tenant and guarantor.

119.   Defendants also had access to superior and exclusive knowledge about the Blytheville Property investment opportunity, such as information about the financial performance of the tenants, HSH, HSMG, their affiliate entities, and the flow of funds to and from those entities.

120.   Defendants breached their fiduciary duties to Plaintiffs by, inter alia, failing to investigate the legitimacy of the tenant and guarantor or concealing their knowledge regarding the same and by making the materially false or misleading representations or omissions alleged above.

121.   Defendants' breach of fiduciary duties directly and proximately caused injury and damages to Plaintiffs.

122.   As a result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial.

123.   Because Defendants' conduct was intentional, knowing, reckless, and malicious, and in disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive or exemplary damages in an amount to be determined by the trier of fact.

**FIFTH CAUSE OF ACTION**
**(Unjust Enrichment of Defendants against All Defendants)**

124.   By this reference, the foregoing allegations are realleged and incorporated herein.

125.     Plaintiffs conferred a benefit on the Defendants by making their investment in the Blytheville Property.

126.     Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from the proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and perpetuation of the overall scheme.

127.     Defendants knowingly benefitted from the proceeds of the Blytheville transaction, and diverted invested money to purposes not benefiting Plaintiffs.

128.     Under the circumstances, equity and justice demand that Defendants not be permitted to retain the benefits conferred upon them by Plaintiffs without compensating Plaintiffs.

129.     By reason of Defendants' unjust enrichment, Plaintiffs are entitled to a judgment awarding an amount to be determined at trial, but which may be measured by the total amount of benefit that Plaintiffs have conferred upon Defendants, together with all other applicable relief at law or in equity, including but not limited to a constructive trust requiring to hold funds for Plaintiffs' benefit and return them as ordered by the Court.

130.     Plaintiffs are further entitled to a full recovery of pre- and post-judgment interest, costs of court, attorney's fees under contract or by law, and such further relief as the Court may deem appropriate under the circumstances.

## SIXTH CAUSE OF ACTION
### (Conspiracy against All Defendants)

131.     By this reference, the foregoing allegations are realleged and incorporated herein.

132.     Defendants combined and conspired with the purpose to induce the purchase of the Blytheville Property based upon material misrepresentations and omissions to Plaintiffs.

133.    Defendants further conspired to mislead Plaintiffs and other investors as to the nature of their investment by cooperating with shell entities who would commit to back long-term leases which Defendants knew had no economic value.

134.    On information and belief, all Defendants agreed orally, in writing, or implied through their conduct to a scheme whereby property would be sold at highly inflated prices based upon agreements with coconspirators to implement sham long term leases that were only supported through the use of investor money to pay the "rents" on the leases until the scheme inevitably collapsed.

135.    As described above, through this conspiracy Defendants sold investments to Plaintiffs at highly inflated prices and with the object of skimming profits from these sales and deceiving investors until the scheme collapsed.

136.    As a result of this conspiracy, Plaintiffs sustained and will continue to sustain substantial injury, loss and damages in an amount to be proven at trial.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs request relief as follows:

A.    An award of actual damage and punitive or exemplary damages, attorney's fees, and costs in an amount to be proven at trial, plus any applicable interest.

B.    Pre-judgment interest, attorney fees, and costs of suit to the extent allowed by applicable law.

C.    If for any reason the 1031 exchange is deemed to be invalid, for all taxes, interest, fines, and fees caused by Defendants' malfeasance.

D.    Such other relief as may be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable in this case.

DATED: August 29, 2025.

NELSON CHRISTENSEN
HOLLINGWORTH & WILLIAMS

/s/Wesley D. Felix
Wesley D. Felix,
*Attorneys for Plaintiffs*