Wes Felix (#6539)
**NELSON CHRISTENSEN**
**HOLLINGWORTH & WILLIAMS**
68 S. Main Street, 6th Floor
Salt Lake City, UT 84101
Telephone: (801) 531-8400
Facsimile: (801) 363-3614
wes@nchwlaw.com

*Attorney for the Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DOUGLAS GOLDSMITH, an individual, GOLDSMITH PROPERTIES, LLC a Utah limited liability company<br><br>Plaintiffs,<br><br>vs.<br><br>KEVIN G. LONG, an individual; MILLCREEK COMMERCIAL PROPERTIES, LLC, a Utah limited liability company; MILLROCK BLYTHEVILLE, LLC, a Utah limited liability company; MILLROCK INVESTMENT FUND 1, LLC, a Utah limited liability company; COLLIERS INTERNATIONAL, a Utah company; MARK MACHLIS, an individual; BRENT SMITH, and individual, and GREEN IVY REALTY, INC., a Utah corporation,<br><br>Defendants. | **PLAINTIFFS' OPPOSTION TO DEFENDANTS MARK MACHLIS AND GREEN IVY REALTY, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br><br>Case No. 2:24-cv-00499-AMA-CMR<br><br>Judge Ann Marie McIff Allen<br>Magistrate Judge Cecilia M. Romero |

Plaintiffs Douglas Goldsmith and Goldsmith Properties, LLC, (collectively "Plaintiffs"), through counsel and pursuant to Local Rule 7-1 DUCivR and Fed. R. Civ. P. 12(b), submit this memorandum in opposition to Defendants Mark Machlis's ("Machlis") and Green Ivy Realty,

Inc.'s ("Green Ivy") motion to dismiss second amended complaint ("MTD") [Dkt 104]. The Second Amended Complaint [Dkt. 99] shall be referred to as "SAC".

## I. INTRODUCTION

Mark Machlis, a longtime friend, confidant and real estate agent working on behalf of Douglas Goldsmith persuaded Goldsmith to invest in a commercial property in Blytheville, Arkansas. Machlis introduced Goldsmith to Kevin Long of Millcreek and jointly they touted the advantages of the Blytheville facility; principally, that it came with a dream tenant offering a long-term lease that would provide Goldsmith as a passive investor with a reliable, safe and secure income for many years. Machlis did not disclose that he was compensated as a "development partner" for Millcreek giving him a substantial financial incentive to push Goldsmith into the transaction. Indeed, Goldsmith believed that Machlis was his real estate agent.

There was never a viable tenant for the property. Goldsmith was promised that other TIC investors would come in to develop the property as a state-of-the-art outpatient medical center. This never happened and no development ever took place. As of the time of the closing of the Blytheville transaction, Machlis knew there was no tenant, knew that the doctor he and Long had promised would run the clinic had already been fired by HSH, and that there was no foreseeable replacement. Instead, one million dollars of the purchase price was paid as kickback to HSH and its principal for playing the role of the non-existent "dream tenant." Machlis also knew and did not disclose that Goldsmith was paid approximately two years of sham "rents" before he discovered that there was no tenant and that the so-called rents were paid out of Goldsmith's investment money. This was all part of a much broader fraudulent conspiracy in which investors were bilked out of their money through the sale of property at wildly inflated prices based on the

promise of a guaranteed long-term lease with a well-established, financially stable, market leading medical management company. Contrary to what investors were told, the bulk of the money invested was used to payoff conspirators through multiple commissions, fees and kickbacks and through the payment of sham rents to prop up the Ponzi scheme until it eventually, and inevitably, collapsed.

## II.   STATEMENT OF FACTS AS ALLEGED IN THE SECOND AMENDED COMPLAINT.

Defendants assert multiple facts that are unsupported and inconsistent with the allegations of the SAC. These assertions should be disregarded by the Court. The following assertions of fact come directly from the SAC.

1. Goldsmith's purchase of an interest in the Blytheville, Arkansas investment was structured as a TIC investment. Goldsmith was contractually obligated to permit the sale of up to 9 million in additional investments and to have his proportional interest in the Blytheville property reduced to as little as 27%. ¶¶ 4, 5. Pursuant to the lease, these improvements were owned by Millrock Blytheville and could be sold to TIC investors to obtain additional financing without Goldsmith's consent. *Id.*

2. Goldsmith executed a long-term lease with Millrock Blythville but the terms of that lease and of the purchase agreement gave Millrock the right to sell proportional interests in the property and required Millrock to develop and maintain the property so that it would be suitable for occupation by a healthcare provider as a tenant. Millrock was to develop, manage and maintain the property at all times exercising complete control. "The leases were represented to be triple net, or absolute net and purchasers were assured that they would have no management responsibility. The investment was to be completely passive." SAC ¶ 1.

3. Goldsmith was told he would receive an enhanced rate of return as the first investor in the property. In fact, the Ponzi scheme collapsed before Defendants were able to lure additional investors into the Blytheville scheme.

4. Goldsmith was told that there would be a four-month to one-year construction and development period during which additional TIC investors would invest and Millrock would manage and develop the Blytheville Property. The leases were structured to allow Defendants to market and sell partial interests to new investors to finance the development of the project. SAC ¶ 48.

5. After the construction period, the rent was to increase to $17,094.77. Goldsmith was also told that his investment was structured like a TIC investment, in part so that his purchase would comply with 1031 exchange regulations and that new investors would be brought in and that their investment money would be used to improve the Blytheville Property. Long told Goldsmith that Defendants planned on making approximately $8,000,000 to $9,000,000 in improvements. Long stated that these arrangements had already been made and would be in place if Goldsmith purchased the Blytheville Property. SAC ¶ 49.

6. The TIC structure was retained through a long-term ground lease with Millrock which gave Millrock the right, without the consent of Goldsmith, to market and sell partial interests in the lease connected to the sublease with HSH. In effect, Millrock was the manager and developer of the Blytheville Property with the sole right and obligation to maintain and improve it. SAC ¶¶ 50, 62.

7. Long also told Goldsmith that TIC investors were already lined up for the Blytheville Property including a man named Gabor Koltai. Long told Goldsmith that Koltai was ready to invest one to two million dollars in the Blytheville Property. SAC ¶ 52.

8. Millrock and HSH would have complete control over the management and development of the Blytheville Property. In short, the profitability of Goldsmith's investment would be solely based on the efforts of Millrock and HSH. SAC ¶ 53.

9. Goldsmith was told that the first TIC investor would receive an enhanced rent percentage. Long told Goldsmith that after new investment money of 8 to 9 million was provided, Goldsmith would own a 25% TIC or proportional interest in the property. SAC ¶¶ 58, 61.

10. Goldsmith was provided by Long and Machlis with an "Investment Agreement." This detailed the terms of Goldsmith's investment including: 1) that the deal was to be structured as a TIC investment in which Goldsmith would own, after development, approximately 28% of the total investment; 2) that Millrock had coordinated the execution of a long-term lease and had negotiated a Development Agreement to improve the existing surgical facility; and 3) that total investment in the property would be roughly $9,981,545. SAC ¶ 59.

11. The Lease was expressly contingent upon the provision by Millrock of the Blytheville TIC operating agreement. The parties to the Lease "agree and accept the Membership Interests issued pursuant to the Conversion Right subject to the terms and conditions of the Operating Agreement." The referenced membership interests are the TIC interests to be sold by Millrock for the benefit of the Blytheville Property. SAC ¶ 64.

12.     The PSA bound Goldsmith to the TIC development arrangement. The PSA was expressly contingent upon Goldsmith and Millrock "entering into a 100-year lease of the Property . . . which shall expressly permit Millrock to further develop the Property . . . and to assign fractional interests in the Lease to subsequent investors." SAC ¶ 65.

13.     The combined agreements gave Millrock and HSH complete control of the profitability of the Blytheville investment. The parties understood that the investment was more an investment in the surgery center operation and lease arrangement than it was in the Blytheville Property. As the PSA stated, the parties "acknowledge and agree that the execution and delivery of the Lease is a material inducement to Buyer's purchase of the Property, and that Buyer would not be willing to purchase all or any part of the Property from Seller, or enter into this Agreement, without Seller's express agreement to the terms and conditions of the Lease."

### III.    ARGUMENT

**A. The Sale of Real Property Bundled With a Lease Arrangement Managed by Third Parties and "Guaranteeing" a Passive Long-Term Investment Return is a Security under the Federal Securities Laws.**

Under the 1933 Securities Act a security includes "any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, [or] investment contract . . ." 15 U.S.C. § 77b(a)(1). The United States Supreme Court observed that the definition is broad enough to encompass "virtually anything that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

An "investment contract" was defined in *SEC v. W.J. Howey Co.*, as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to

expect profits solely from the efforts of the promoter or third party." 328 U.S. 293, 298-99 (1946). Subsequent courts have emphasized that when deciding what constitutes a security "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). It is now well-established that the sale of real property when combined with promises related to long-term returns based on third-party leases are typically securities. *OMNI Brokerage, Inc. Argus Realty Investors, L.P. PASSCO Companies, LLC*, SEC No-Action Letter (Jan. 14, 2009). Although these schemes typically involve the sale of tenant-in-common interests, this feature is not essential.  See generally, Note: Betting the Farm: the TIC Turf War and Why TICS Constitute Investment Contracts Under Federal Securities Laws, 1 WM. & Mary Bus. L. Rev. 451 (April 2010). The sale of real property constitutes a security when bundled with a long-term or triple net lease under circumstances where the investor is promised a passive investment guaranteeing or insuring a safe return on the investment without significant involvement by the investor. *See SEC v. Edwards*, 540 U.S. 389 (2004).

As alleged in Goldsmith's Second Amended Complaint, the Defendants disseminated marketing materials touting the passive structure of Millcreek's investments. "With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns than your current real estate investment, giving you more time to do the things you love." [Amended Complaint, ¶¶ 33-35, (Dkt. #5)].  Goldsmith was promised by Machlis and Kevin Long, that Goldsmith would receive monthly rent of $14,447.92 escalating to $17,094.77.  He was promised that there was a dream tenant already in place providing revenue that would support the lease. Goldsmith's reasonable expectation was that he would be a passive investor in the property profiting from the long-term lease he entered with Defendant Millrock

Blytheville, LLC. In fact, he never received any "rent" payments and the long-term tenant purportedly generating revenue to cover the long-term lease never existed. Schemes like the Millcreek scheme have been found to involve the sale of securities.

Indeed, as described in the SAC, complete control of the development, management and operation of the envisioned Blytheville surgery center was ceded to Millrock and HSH. Millrock was empowered both to develop, manage and operate the facility with HSH but also to sell in excess of 9 million dollars of partial ownership interests in the property to subsequent TIC investors.

In *Oak Hill Mgmt. v. Edmund & Wheeler, Inc.,* the court, discussing the Rockwell fraud, a scheme nearly identical to the Millcreek scheme and involving several of the same individuals,[1] found that at the motion to dismiss stage there was at least a question of fact as to whether "the facts alleged could show that the investment was expected to be passive." 2021 U.S. Dist. LEXIS 162584, at *28-29 (D.Vt., Mar. 16, 2022). Because the question of passivity is fact intensive "the question of whether or not the transaction constituted an investment contract is more appropriately addressed in a summary judgment motion." *Id.* Indeed, courts have denied motions for summary judgment where there was a dispute between the parties as to the level of control or passivity of the investor with respect to the investment. *See e.g., San Francisco Residence Club, Inc. v. Amado,* 2010 U.S. Dist. LEXIS 55134, *14 (where there is a dispute of fact as to the level of plaintiff's involvement in management the determination of whether the investments were "securities and subject to the registration requirements under the 1933 Act depends upon

---

[1] Indictment in Case No: 2:23-cr-00281, D. Utah, July 26, 2024, attached as <u>Exhibit A</u>.

resolution of these disputed facts. The question is not, therefore, one that can be answered at the summary judgment phase. . .").

Defendants tacitly acknowledge that the Blytheville investment was structured as a TIC investment, but that this does not matter because no other investors were ever obtained. First, it does not matter whether one or many investors are involved in a particular fraud. What matters is the overall scheme. It cannot be the case that Goldsmith's purchase would have been a security but for the fact that the Ponzi scheme collapsed and the fraud was exposed before Millrock and Millrock were able to lure in additional victims. As the court in *Baroi* observed, the "application of the securities laws cannot be avoided by breaking up a transaction or scheme into a series of purportedly separate agreements." *Baroi*, 914 F. Supp.2d at 1193, *citing Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (a security may exist even if it is not in one neat, tidy, certificate but instead consists of a general scheme of profit-seeking activities). Especially in the Tenth Circuit, the fact that a particular fraud involved only one investor is not relevant when the economic reality is that the investment was part of a larger fraudulent scheme involving numerous actual and potential victims.

Machlis acknowledges that Goldsmith was entitled to expect his "pre-fixed monthly rent payments from Millrock Blytheville for the duration of the lease." [Machlis Motion, at 10, (Dkt. #37)]. Nevertheless, Machlis argues that this expectation of a return is not based upon the efforts of others, because "the only risk is that Millrock Blytheville fails to make lease payments." This is a non sequitur. The essence of the fraud is the representation that there is a financially stable tenant in place who will guarantee the payment of the lease when in fact, Defendants knew the lessee and the supposed tenant had no assets and no ability to pay the above market rents

promised. In this case, Long and Machlis lied about additional investors ready to finance the development of the surgery center, lied about the existing surgery center and lied about the existence of any HSH tenant – there was none – ready to take over and operate the facility as developed.

Defendants counter that "there is no allegation or evidence that the lease agreement or Millrock Blytheville's management of the commercial property was essential" to the transaction. This statement is false. Goldsmith alleges that the property was marketed "as safe and reasonable based on a 20-year lease agreement with HealthCare Solutions Holdings Inc. ("HSH") that would return between 6% and 9% on the invested money." [Amended Complaint, at ¶ 4, (Dkt. #5)]. Defendants represented that the solid tenant provided "a safe and secure source of passive income." [*Id*., at ¶ 31.] Goldsmith was told by Long and Machlis that "HSH had already agreed to be the tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue." [*Id*., at ¶ 40.] Contrary to Defendants' contentions, the long-term lease was the most critical piece of the investment sold to Goldsmith. And that piece turned out to be a fiction created by Long and Machlis.

Defendants cite *Alumni v. Development Resources Group, LLC*, for the proposition that where Plaintiffs have "at least some ability to control" the profitability of the investment, they are not relying on the efforts of others for purposes of the Securities and Securities and Exchange Acts. 445 F3d. Appx. 288, 297-98 (11th Cir. 2011). But in *Alumni* the property was not marketed as having a guaranteed lease managed by others. Nor was there any expectation of a fixed return on a passive investment. Instead, there was an existing **one-year lease** which provided no expectation of any returns beyond that period except through the managerial efforts of the

10

purchasers. *See, e.g., Baroi v. Platinum Condo. Dev., LLC*, 914 F. Supp. 2d 1179, 1197 (D. Nev. 2012) (distinguishing *Alumni* on similar bases).

Here the fraudulently guaranteed long-term returns were the essential core of the investment. The PSA required execution of the long-term lease which in turn ceded effective control of the property to Millrock and HAS. As in *Howey*, the purchase of real estate combined with representations as to future revenues from a third-party is the purchase of a security. *SEC v. Howey Co.*, 328 U.S. 344, 351 (1934) (finding that the sale of plots of land containing orange groves managed by others was the sale of a security).

Goldsmith was led to expect profits solely from the development and management efforts of Millrock combined with the guaranteed long-term success of HSH in operating the newly developed surgical center. "Although the Howey test describes the third prong of the investment contract test as expecting profits derived "solely" from the promoter's or a third party's efforts, courts require only that 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Baroi v. Platinum Condo. Dev. LLC*, 914 F.Supp.2d 1179, 1195 (D. Nev. 2012). As the Baroi court went on to say, whether the rental agreement is "mandatory or optional is not dispositive of the question. Where an investor has the legal ability to control the investment, a security still may be found if the investor shows he is dependent as a practical matter, in that he is unable to exercise meaningful powers of control or to find others to manage his investment." *Id.,* at 1196. In this case, Goldsmith was both legally and practically bound to Millrock through the PSA, the long-term ground lease, the HAS sublease and the Operating Agreement. The profitability of his investment was wholly dependent upon the success of Millrock's successful

development and management of the property. Goldsmith's investment is, therefore, a security under the federal securities laws.

It is now well-established that the sale of real property when combined with promises related to long-term returns based on third-party leases are typically securities. *OMNI Brokerage, Inc. Argus Realty Investors, L.P. PASSCO Companies, LLC*, SEC No-Action Letter (Jan. 14, 2009). Although these schemes usually involve the sale of tenant-in-common interests, this feature is not essential.  See generally, Note: Betting the Farm: the TIC Turf War and Why TICS Constitute Investment Contracts Under Federal Securities Laws, 1 WM. & Mary Bus. L. Rev. 451 (April, 2010). The sale of real property constitutes a security when bundled with a long-term often triple net lease under circumstances where the investor is promised a passive investment guaranteeing or insuring a safe return on the investment without significant involvement by the investor. *See, e.g., SEC v. Sunwest Mgmt.*, 2009 U.S. Dist. LEXIS 114917, *15 (D. Or., Dec. 9, 2009)

Schemes much like the Millrock/Millcreek Ponzi scheme have been found to involve the sale of securities. These schemes frequently involve the payment of sham rents to cover up the fraud. *Sunwest*, 2009 U.S. Dist. LEXIS, at * 6 ("the practice of paying rent when the investment was failing was misleading to investors"). In this context, it does not matter whether there is one investor or several. In the Tenth Circuit, there is no rigid commonality requirement.  Instead, the Tenth Circuit applies the Howey test to determine whether a common enterprise and a "security" exist in a particular case by examining the economic reality of the transactions that occurred. *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 924 (10th Cir. 1985). The facts as alleged in the SAC describe an investment in a scheme in which Goldsmith reasonably expected

that he would earn a profit based entirely on the efforts of Millrock and HSH. SAC ¶¶ 64, 65, 66. Regardless of whether the expected returns are fixed or floating, if an investor like Goldsmith has the reasonable expectation that his expected returns would be provided through the efforts of others, his investment was the purchase of a security. *See, e.g., SEC v. Edwards*, 540 US 389 (2004) (holding that a sale-leaseback was an investment contract because the purchasers were promised a fixed return on their investment, which depended on the managerial efforts of the promoter). It is therefore immaterial whether the investment return is fixed or not.

In *Oak Hill Mgmt. v. Edmund & Wheeler, Inc.,* the court, discussing the Rockwell fraud, a scheme nearly identical to the Millcreek scheme and involving several of the same individuals, found that at the motion to dismiss stage there was at least a question of fact as to whether "the facts alleged could show that the investment was expected to be passive." 2021 U.S. Dist. LEXIS 162584, at *28-29 (D.Vt., Mar. 16, 2022). "[W]hether a particular contract is an investment contract under federal securities law is a question of fact that is rarely appropriate on consideration of a motion to dismiss. Only when there are no reasonable allegations to support the existence of an investment contract may a court grant a motion to dismiss a security claim." *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975). Because the question of passivity is fact intensive "the question of whether or not the transaction constituted an investment contract is more appropriately addressed in a summary judgment motion." *Id.* Indeed, courts have denied motions for summary judgment where there was a dispute between the parties as to the level of control or passivity of the investor with respect to the investment. *See, e.g., San Francisco Residence Club, Inc. v. Amado,* 2010 U.S. Dist. LEXIS 55134, *14 (where there is a dispute of fact as to the level of plaintiff's involvement in management the determination of whether the

investments were "securities and subject to the registration requirements under the 1933 Act depends upon resolution of these disputed facts. The question is not, therefore, one that can be answered at the summary judgment phase. . .")

The core of the Millcreek/Millrock fraudulent scheme was the requirement of a long-term lease combined with the fraudulent representation that there was a financially stable tenant in place who would guarantee the payment of the lease. In this case, Long and Machlis lied about the existence of any HSH tenant – there was none. Contrary to the repeated false claim that Blytheville was a simple sale-leaseback transaction, the fraud involved multiple interlocking agreements which ceded control of the investment to Millrock as manager and developer. SAC ¶¶ 64, 65, 66, 67. The closing included a mandatory long-term lease with Millrock Blytheville who in turn represented that they had a lease with HSH during the period of construction.[2] In addition, the PSA required that the property would be developed and managed by Millrock. The requirement of a long-term ground lease with Millrock in the PSA manifested the parties' expectation that the investment was in Millrock's development and management of the HSA surgical facility. If that project failed, the investment would fail.

Defendants counter that "there is no allegation or evidence that the lease agreement or Millrock Blytheville's management of the commercial property was essential" to the transaction.

---

[2] The transaction was structured as the sale of the commercial property with a "ground lease" to Millrock Blytheville who in turn was to have a longer-term lease with HSH. The structure was required for the purchase to comply with the build-to-suit requirements of a 1031 exchange, i.e., the value of the property as improved would equal the value of the relinquished property for tax purposes. In fact, there was no real plan to improve the property, no tenant paying for the improvements and no lease with HSH. We do not know at this stage of the litigation whether HSH paid no rent or whether they made two or fewer rent payments to Millrock. We do know now that the sham rent payments were made by Millrock Investment Fund 1, LLC a factor evidencing the intermingling of funds among the entities manipulated by Millcreek.

This statement is false. Goldsmith alleges that the property was marketed "as safe and reasonable based on a 20-year lease agreement with HealthCare Solutions Holdings Inc. ("HSH") that would return between 6% and 9% on the invested money." More importantly, the PSA states that "Buyer would not be willing to purchase all or any part of the Property from Seller, or enter into this Agreement, with Seller's express agreement to the terms and conditions of the Lease." SAC ¶¶ 64, 65, 66. Goldsmith was told by Long and Machlis that "HSH had already agreed to be the tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue." [*Id*., at ¶ 40.] Contrary to Defendants' contentions, the long-term lease was the most critical piece of the investment sold to Goldsmith. And that piece turned out to be a fiction created by Long and Machlis.

Defendants contend that there is no security when the investor has "managerial rights over the tenant." This has never been the law. In *Howey*, the wellspring of the definition of security, investors purchased land in Florida that was to be operated as orange groves. Investors were told that they could purchase real estate combined with a service contract with a company operating the orange grove. *SEC v. Howey Co*., 328 U.S. 344, 351 (1934) (finding that the sale of plots of land containing orange groves managed by others was the sale of a security). The Supreme Court was careful to note that although most of the investors contracted with the service provider offered by the seller, each purchaser "was free to make arrangements with other service companies." *Id*., at 295. Defendants make the same argument – that there is no security unless the purchaser is completely divested of management control – that was made by Justice Frankfurter in dissent and which has been rejected by the Supreme Court majority from 1946 to the present.

As Defendants acknowledge, the Tenth Circuit has rejected rigid tests of commonality and instead looks to the economic reality of the transaction. "Thus, the determining factor of a common enterprise and the economic reality of the transaction is whether or not the investment was for profit." *Campbell v. Castle Stone Homes, Inc*., 2011 U.S. Dist. LEXIS 27266, *12 (D. Utah, March 15 2011) (*citing Berrios-Bones v. Nexidis,* LLC, 2007, U.S. Dist. LEXIS 80283 *5 (D. Utah, Oct. 30, 2007). Here, the investment was marketed by Long and Millcreek as entirely passive. The investor need not worry about managing the property, instead the investor could sit back passively with the secure expectation of continuous long-term returns on his investment. [Amended Complaint at ¶¶ 32-35 (Dkt. #5)]. ("With our passive lease structure, you can leave the headaches of being a landlord behind. We deliver fully managed properties with better returns…").

Judge Stewart in *Campbell v. Castle Stone Homes*, found a common enterprise where property was sold with representations that the investment would "create wealth" that there would be a guaranteed client profit. In the present case, plaintiffs were promised specific returns . . ." 2011 U.S. Dist. LEXIS 27266, * 13-14. Goldsmith's investment was tied to a mandatory long-term lease which ceded managerial control to Millrock. He was promised guaranteed long term returns for an investment that was completely passive. In this circumstance, the facts alleged are sufficient to describe an investment scheme creating a common enterprise. *Id.* [3]

---

[3] Judge Stewart, following Tenth Circuit precedent, noted that even if there were a dispute as to the extent of control remaining with the purchaser "determining whether a particular contract is an investment contract under federal securities law is a question of fact that is rarely appropriate on consideration of a motion to dismiss." *Campbell,* 2011 U.S. Dist. LEXIS 27266, *11.

## IV. CONCLUSION

For the above reasons, Defendants Mark Machlis and Green Ivy Realty's Motion to Dismiss should be denied.

DATED this 17th day of October, 2025.

NELSON CHRISTENSEN
HOLLINGWORTH & WILLIAMS

 /s/ Wesley D. Felix
Wesley D. Felix
*Attorney for Plaintiffs*
