UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| DOUGLAS GOLDSMITH et al.,<br><br>　　　Plaintiffs,<br><br>v.<br><br>KEVIN LONG et al.,<br><br>　　　Defendants. | **MEMORANDUM DECISION AND ORDER REGARDING MOTIONS TO DISMISS**<br><br>Case No. 2:24-cv-00499-AMA-CMR<br><br>District Judge Ann Marie McIff Allen<br><br>Magistrate Judge Cecilia M. Romero |

This matter comes before the Court on the following Motions:

- Motion to Dismiss filed by Defendants Millrock Blytheville LLC ("Millrock Blytheville"), Millrock Investment Fund 1 LLC ("Millrock"), and Brent Smith (collectively, "Millrock Defendants");[1]

- Motion to Dismiss filed by Defendants Green Ivy Realty, Inc. and Mark Machlis (collectively, "Green Ivy Defendants").[2]

The Court did not hear oral argument.[3] For the reasons discussed below, the Court will grant in

---

[1] ECF No. 103, filed September 12, 2025.

[2] ECF No. 104, filed September 19, 2025.

[3] Under DUCivR 7-1(g), a request for oral argument on a motion will be granted only on good cause shown. Otherwise, "the court will determine a motion based upon the parties' written memoranda." DUCivR 7-1(g). The Millrock Defendants claim that good cause for oral argument exists because they seek dismissal of the claims against them. The Court is not persuaded by this cursory assertion, from which it would seem to follow that good cause must exist for oral argument on every motion to dismiss simply due to the nature of such a motion. Here, the Court is not convinced that oral argument would be beneficial to the Court or productive for the parties at this juncture. Therefore, the Court finds that the Millrock Defendants have not demonstrated good cause to support the request for oral argument, and the request is denied.

part and deny in part the Millrock Defendants' Motion. The Court will deny the Green Ivy

Defendants' Motion.

## BACKGROUND[4]

At the time relevant to this action, Defendants were in the business of marketing and

selling commercial real estate with long-term third-party tenants.[5] They did this by purchasing

commercial properties and then marketing them to potential investors, portraying the leases as

safe and secure sources of passive income.[6] Millcreek Commercial Properties, LLC

("Millcreek") was the exclusive marketing arm of Millrock Investment Fund 1, LLC

("Millrock").[7] Millcreek and Millrock shared owners and managers and were in practice often

indistinguishable.[8] Brent Smith was an owner and manager of Millcreek and Millrock,[9] and he

also served as the investor relations vice president or investor relations partner for both Millcreek

and Millrock.[10] Mr. Smith was directly involved in the creation of the marketing materials for

Millcreek, and he supervised and conducted oversight of the marketing materials to ensure their

accuracy.[11] Kevin Long was also an owner of Millrock, the managing agent for Millrock and

Millrock Blytheville LLC ("Millrock Blytheville"), the co-founder and vice president of

---

[4] The facts below are taken from Plaintiffs' Second Amended Complaint ("SAC"), as well as the Lease Agreement attached to the Green Ivy Defendants' Motion to Dismiss. ECF Nos. 99, 104, Ex. B. The Court notes that it considers the Lease Agreement, ECF No. 104, Ex. B, because this document is referred to in the SAC, central to Plaintiffs' claims, and no party has disputed its authenticity. For the purposes of the Motions at issue, the Court will treat the well-pleaded facts alleged in the SAC as true.
[5] *See* ECF No. 99 ¶¶ 36–40.
[6] *Id.* ¶ 38.
[7] *Id.* ¶ 17.
[8] *Id.*
[9] *Id.* ¶ 29.
[10] *Id.* ¶ 30.
[11] *Id.*

Millcreek, as well as an employee and agent for Colliers International ("Colliers").[12] Mr. Long

marketed the investments sold by Millrock through Colliers and Millcreek, and his roles in the

entities were interwoven. [13] In doing so, he was paid commissions of up to 6% by Colliers and

commissions from Millrock to Millcreek of approximately 2%, none of which was disclosed to

Mr. Goldsmith.[14]

Millcreek stated on its website that investors could "[r]est assured that our portfolio is

rock solid. We rigorously vet every property we offer."[15] Millcreek also represented that it sold

only properties with tenants who can "thrive in any economic environment."[16] One such

purported tenant was Healthcare Solutions Holdings, Inc. ("HSH").[17] In the marketing materials,

HSH was represented as "a publicly-traded medical service and device company focused on

providing clinicians with state-of-the-art diagnostic and therapeutic tools."[18] HSH was, however,

a shell company without any substantive operations or assets that was a wholly owned subsidiary

of Health Care Solutions Management Group, Inc., which was forced into involuntary

bankruptcy in September of 2023.[19] HSH was also not a public company at the time of the

relevant transactions and only became such through a reverse merger, avoiding most of the

disclosure requirements imposed on new public companies.[20]

In early 2021, HSH, with the cooperation of Millcreek and Millrock, purchased the

---

[12] *Id.* ¶¶ 14–15.
[13] *Id.* ¶ 15.
[14] *Id.* ¶ 16.
[15] *Id.* ¶ 40.
[16] *Id.*
[17] *Id.* ¶ 42.
[18] *Id.*
[19] *Id.* ¶ 44.
[20] *Id.* ¶ 46.

Blytheville Property for $845,000.[21] Immediately thereafter, the Blytheville Property was resold to Millrock Blytheville, a wholly owned subsidiary of Millrock, for $1,825,000.[22] Millcreek, Millrock, Mr. Long, and Mr. Machlis then marketed the Blytheville Property to Plaintiff Douglas Goldsmith.[23] Mr. Goldsmith was told that HSH had already agreed to be the third-party tenant and that Dr. Sadeem Mahmood, an interventional cardiologist, would be working out of the facility and providing revenue.[24] Mr. Goldsmith was also told that there would be a four-month to one-year construction and development period to prepare the property for HSH's use.[25]

At a meeting on December 28, 2020, attended by Mr. Machlis and Mr. Long via Zoom, Mr. Long told Mr. Goldsmith that his investment in the Blytheville Property would be structured like a tenant-in-common ("TIC") investment so that his purchase would comply with 1031 exchange regulations and that new investors would be brought in, with their investment money being used to develop the Blytheville Property.[26] According to Mr. Long, Defendants planned on making approximately eight to nine million dollars in improvements to the property.[27] During the construction period, HSH physicians would work from trailers on site, and Mr. Goldsmith would receive rent of $14,447.92 per month.[28] After the construction period, the rent was to increase to $17,094.77 per month.[29] Mr. Long told Mr. Goldsmith that arrangements for the development plans had already been made and would be in place if Mr. Goldsmith purchased the Blytheville

---

[21] *Id.* ¶ 47.
[22] *Id.*
[23] *Id.* ¶ 48.
[24] *Id.*
[25] *Id.*
[26] *Id.* ¶ 49.
[27] *Id.*
[28] *Id.*
[29] *Id.*

Property.[30] Mr. Long also told Mr. Goldsmith that he would have no maintenance or management responsibilities.[31] Instead, the Blytheville Property would be subject to a triple net lease, and Millrock and HSH would be responsible for maintenance, management, taxes, and any other expenses.[32] Mr. Goldsmith's investment would be, as stated by Mr. Long, completely passive, and if Millrock and HSH performed as represented, Mr. Goldsmith would receive a guaranteed return of 6 to 7.25 percent on his investment.[33]

Similar representations were communicated to Mr. Goldsmith at various meetings and through documents over the course of 2021.[34] At some time, Mr. Smith gave Mr. Goldsmith a Blytheville Investment Agreement.[35] On January 14, 2021, Mr. Long and Mr. Machlis represented that thorough due diligence had been done on the development partner and on the tenant.[36] Mr. Long and Mr. Machlis also represented that HSH physicians would be onsite at the time of closing.[37]

Ultimately, in August of 2021, Mr. Goldsmith purchased the Blytheville Property for around $2,829,478.[38] The Purchase and Sale Agreement ("PSA") provided that the sale was expressly contingent on Mr. Goldsmith and Millrock "entering into a 100-year lease of the Property . . . which shall expressly permit [Millrock] to further develop the Property . . . and to assign fractional interests in the Lease to subsequent investors."[39] Upon purchasing the Property,

---

[30] *Id.*
[31] *Id.* ¶ 53.
[32] *Id.*
[33] *Id.*
[34] *Id.* ¶¶ 58–60.
[35] *Id.* ¶ 59.
[36] *Id.* ¶ 58.
[37] *Id.*
[38] *Id.* ¶ 61; *id.* ¶ 4.
[39] *Id.* ¶ 65.

Mr. Goldsmith also entered into a twenty-year Lease Agreement ("Lease") with Millrock Blytheville, with options to extend the lease to 100 years.[40] The Lease reflects a monthly rent to be paid to Mr. Goldsmith of $14,447.92 during the construction period, followed by a monthly rent of $17,094.77 after the construction period.[41] The Lease provides that "[t]he Construction Period Rent and the Post Construction Period Rent shall be collectively referred to as the 'Fixed Rent.'"[42] The Lease also provides that Millrock Blytheville "shall be fully entitled to, at its sole cost and expense [] make any and all changes, additions, improvements or repairs to the Leased Premises . . . without [Mr. Goldsmith's] prior written consent[,]" as well as that Millrock Blytheville "shall be entitled to solicit, invest, borrow and encumber its leasehold interest in the Property as necessary to finance the construction, installation, maintenance and operation of all improvements to the Property."[43] Furthermore, under the terms of the Lease, Millrock Blytheville, at its "sole cost and expense, shall maintain the Leased Premises in good order, condition and repair" and shall pay all utilities and taxes but for "federal or state income taxes, franchise taxes, or estate, inheritance or gift taxes, or any other income taxes assessed against Tenant or Landlord."[44]

Millrock Blytheville paid rent to Mr. Goldsmith for around two years.[45] However, unbeknownst to Mr. Goldsmith, HSH had ceased making payments under the sublease by December of 2021[46]—HSH filed for bankruptcy less than two years after the closing of the sale

---

[40] *Id*. ¶ 61; ECF No. 104, Ex. B at 2.1–2.2.
[41] ECF No. 104, Ex. B at 3.1.
[42] *Id*.
[43] *Id*. at 5.2.
[44] *Id*. at 6–7.
[45] ECF No. 99 ¶ 67.
[46] *Id*. ¶ 71.

of the Property.[47] Also unknown to Mr. Goldsmith was that no efforts were made to develop the Blytheville Property.[48] To conceal this, Millrock and Millrock Blytheville paid the rent using Mr. Goldsmith's own invested money until Mr. Goldsmith was told that Millrock Blytheville had no more funds[49]—Millrock Blytheville was undercapitalized such that it had no assets other than Mr. Goldsmith's investment, and it was entirely dependent upon intermingled funds with Millrock.[50] Mr. Goldsmith discovered that the ophthalmologist who initially sold the building had continued to work there, waiting for someone to tell her to leave or pay rent.[51] No preparations for construction were made, and no trailers were ever placed on site from which physicians could have worked temporarily.[52] The purported architectural plans were never provided to Mr. Goldsmith.[53] Dr. Mahmood, the cardiologist who Defendants represented was going to work at the facility, had worked for HSH but had been fired before the Blytheville Property was sold to Mr. Goldsmith.[54] Dr. Mahmood had never worked at nor been approached to work at the Blytheville facility.[55] In short, no HSH physicians ever worked at the Blytheville Property.[56] The Blytheville Property is currently worth roughly $507,000.[57]

Plaintiffs initiated this action on July 16, 2024.[58] Plaintiffs' Second Amended Complaint ("SAC") was filed on August 29, 2025.[59] Defendants Long and Colliers filed Answers to the

---

[47] *Id.* ¶ 68.
[48] *Id.* ¶ 67.
[49] *Id.* ¶¶ 67, 72.
[50] *Id.* ¶ 67.
[51] *Id.* ¶ 7.
[52] *Id.*
[53] *Id.* ¶ 73.
[54] *Id.* ¶ 55.
[55] *Id.*
[56] *Id.* ¶ 8.
[57] *Id.* ¶ 10.
[58] ECF No. 1.
[59] ECF No. 99.

SAC.[60] The Millrock Defendants filed their Motion to Dismiss on September 12, 2025.[61]

Plaintiffs filed an Opposition on October 10, 2025,[62] to which the Millrock Defendants replied

on October 24, 2025.[63] The Green Ivy Defendants filed their Motion to Dismiss on September

19, 2025,[64] and Plaintiffs opposed on October 17, 2025.[65] The Green Ivy Defendants filed their

Reply on October 31, 2025.[66]

<u>**LEGAL STANDARD**</u>

Defendants bring their Motions to Dismiss pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). "Motions to dismiss for lack of subject matter jurisdiction under Rule

12(b)(1) may take one of two forms": a party may make a facial challenge, questioning the

sufficiency of the complaint, or a factual challenge, questioning the facts beyond the complaint

upon which subject matter jurisdiction depends.[67] "In addressing a facial attack, the district court

must accept the allegations in the complaint as true."[68] But "[i]n addressing a factual attack, the

court does not presume the truthfulness of the complaint's factual allegations, but has wide

discretion to allow affidavits, other documents, and a limited evidentiary hearing."[69]

Under Federal Rule of Civil Procedure 12(b)(6), a claim is subject to dismissal if the

plaintiff's complaint fails to "state a claim upon which relief can be granted." In construing a

plaintiff's complaint, the Court will assume the truth of any well-pleaded facts and draw all

---

[60] ECF Nos. 102, 111.
[61] ECF No. 103.
[62] ECF No. 105.
[63] ECF No. 107.
[64] ECF No. 104.
[65] ECF No. 106.
[66] ECF No. 108.
[67] *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).
[68] *Id*.
[69] *Id*. (citation modified).

reasonable inferences in the light most favorable to the plaintiff.[70] To survive a Rule 12(b)(6)

motion, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to

relief that is plausible on its face.'"[71] "[F]acts subject to judicial notice may be considered in a

Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary

judgment."[72] Furthermore, "courts may consider documents that a plaintiff (1) attaches to [his]

complaint; (2) incorporates by reference in [his] complaint; or (3) refers to in [his] complaint and

that are central to [his] complaint and indisputably authentic."[73]

## **DISCUSSION**

### A.    VIOLATIONS OF § 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 (COUNT I)

Pursuant to § 10(b) of the Securities Exchange Act, it is unlawful for any person "[t]o use

or employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe."[74] To implement § 10(b), the Securities and Exchange Commission

("SEC") promulgated Rule 10b-5, which provides that it is unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.[75]

---

[70] *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

[71] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[72] *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

[73] *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1297 (10th Cir. 2025) (citation modified).

[74] 15 U.S.C. § 78j(b).

[75] 17 C.F.R. § 240.10b–5.

To state a claim based on Rule 10b-5(b), a plaintiff must establish the following elements:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages because of [its] reliance.[76]

To state a claim under Rule 10b-5(a) and (c) for market manipulation, "a plaintiff must allege: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."[77] "The deceptive or manipulative activity must have occurred in connection with the purchase or sale of a security."[78]

The Green Ivy Defendants argue that the transaction did not involve the purchase or sale of a security as that term is employed in the Act. The Millrock Defendants contend that the SAC fails to meet the applicable heightened pleading standards with respect to their involvement in the alleged fraud. The Court will address the Green Ivy Defendants' arguments before turning to those of the Millrock Defendants.

### 1.      Purchase and Sale of Securities

The Securities Acts were enacted in response to "serious abuses in a largely unregulated securities market," as well as to regulate "*investments,* in whatever form they are made and by whatever name they are called."[79] In furtherance of these purposes, "Congress 'painted with a broad brush' in defining a 'security' in recognition of the 'virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who

---

[76] *In re Overstock Sec. Litig.*, 119 F.4th 787, 799 (10th Cir. 2024) (alteration in original).
[77] *Id*. at 801 (citation modified).
[78] *Id*. (citation modified).
[79] *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (emphasis in original).

seek the use of the money of others on the promise of profits[.]'"[80] Accordingly, § 2(a)(1) of the 1933 Act, 15 U.S.C. § 77b(a)(1), and § 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), "in slightly different formulations which the [Supreme Court has] treated as essentially identical in meaning, define 'security' to include 'any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . [or any] instrument commonly known as a 'security.'"[81] The term "investment contract" is not defined.[82]

"[I]n the context of civil suits, the ultimate determination whether an instrument is a security is one of law."[83] The Supreme Court set forth the test to determine whether a particular scheme constitutes an investment contract in *SEC v. W.J. Howey Company,* 328 U.S. 293 (1946). Under *Howey,* "[a] scheme constitutes an investment contract if it involves (1) an investment of money; (2) in a common enterprise; (3) with profits derived solely from the efforts of others."[84] This test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[85] In applying the test, "'form should be disregarded for substance' and courts should focus on the 'economic realities underlying a transaction, and not on the name appended thereto.'"[86] Moreover, "the word 'solely' as used in the *Howey* definition must not be given an unduly restrictive application."[87]

---

[80] *S.E.C. v. Shields*, 744 F.3d 633, 641 (10th Cir. 2014) (quoting *Reeves*, 494 U.S. at 60–61).
[81] *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (internal citation omitted).
[82] *Id.*
[83] *S.E.C. v. Thompson*, 732 F.3d 1151, 1161 (10th Cir. 2013).
[84] *Klein v. Roe*, 76 F.4th 1020, 1035 (10th Cir. 2023) (citing *Howey*, 328 U.S. at 301).
[85] *Howey*, 328 U.S. at 299.
[86] *Shields*, 744 F.3d at 643 (internal citation omitted) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848–49 (1975)).
[87] *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 877 (10th Cir. 1975).

There is no dispute with respect to the first element of the *Howey* test. Rather, the Green Ivy Defendants contend that Plaintiffs have failed to sufficiently allege a common enterprise with profits derived solely from the efforts of others. The Court disagrees.

"A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investments or of third parties."[88] If "a transaction is purely commercial in nature (for example, a commercial loan or a sale of assets), then it does not give rise to a 'common enterprise' or a 'security.'"[89] But if a "transaction is in reality an investment . . . then it creates a 'common enterprise' and gives rise to a 'security' falling within the ambit of the 1933 and 1934 Securities Acts."[90] Although the Green Ivy Defendants contend that there was no common enterprise due to the lack of horizontal commonality—"that is, a pooling of funds received by a promoter from multiple investors"[91]— "the rigid 'horizontal commonality' requirement . . . has never been a part of the law of this circuit."[92] Rather, courts are to, as explained above, determine the "'economic reality' of the transactions that occurred."[93]

The Green Ivy Defendants argue that the fortunes of Plaintiffs are not "interwoven with or dependent upon the efforts and success of" Millrock Blytheville because Plaintiffs are only entitled under the Lease to the Fixed Rent payments. While the Green Ivy Defendants have pointed to other courts who have been persuaded by this argument in the past,[94] the Supreme

---

[88] *Walsh v. Int'l Precious Metals Corp.*, 510 F. Supp. 867, 871 (D. Utah 1981) (citation modified).
[89] *McGill v. Am. Land & Explor. Co.*, 776 F.2d 923, 925 (10th Cir. 1985).
[90] *Id.*
[91] *Id.* at 924.
[92] *Id.* at 925.
[93] *Id.*
[94] *See, e.g., Almaden Plaza Assocs. v. United Tr. Fund Ltd. P'ship*, 860 P.2d 289 (1993).

Court has since made clear that "[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test."[95] Indeed, "investments pitched as low-risk (such as those offering a 'guaranteed' fixed return) are particularly attractive to individuals more vulnerable to investment fraud[.]"[96] The notion that the alleged scheme "falls outside the definition of [investment contract] because [Mr. Goldsmith] had a contractual entitlement to a return[] is incorrect and inconsistent with [Supreme Court] precedent."[97] The Court is, after all, "considering investment *contracts*."[98]

The Green Ivy Defendants also make much of the decision in *Elson v. Geiger*, 506 F. Supp. 238 (E.D. Mich. 1980). But as the *Elson* court states, "[t]he simplest case where a land purchase may be recharacterized as a security investment is where the investor purchases undeveloped land at an inflated price with the developer's 'blue-sky' promise that a grand resort complex will soon be completed."[99] While the "sale-and-leasebacks" in *Elson* did not involve such a scheme, it appears to the Court that, based upon the allegations in the SAC, the transaction at issue in this case does. Here, the Blytheville Property was specifically promoted with promises of extensive renovations and an affiliate leaseback agreement with a pre-arranged, "low-risk" sublessee. It was represented to Mr. Goldsmith that Defendants planned on making approximately eight to nine million dollars in improvements to the Property and that new investors would be brought in, with their investment money being used toward this development.[100] Mr. Goldsmith was also promised a guaranteed return of 6 to 7.25 percent on his

---

[95] *Edwards*, 540 U.S. at 394.
[96] *Id.*
[97] *Id.* at 397.
[98] *Id.* (emphasis in original).
[99] 506 F. Supp. at 242–43.
[100] ECF No. 99 ¶ 49.

investment.[101] From the SAC's allegations, it appears that Mr. Goldsmith was not, in purchasing the Blytheville Property at an inflated price,[102] simply engaged in a purely commercial transaction for that property; rather, he invested in Defendants' purported development of a surgical center for HSH as a means to generate wealth. In other words, Mr. Goldsmith purchased a property at an inflated price based upon Defendants' "blue sky" promise that a surgical center to be operated by HSH would soon be completed. And the success of this investment "depended on the promises made both in the promotion and sale of the [P]roperty: the promised renovations and leaseback agreement."[103] Thus, Mr. Goldsmith's fortunes were interwoven with and dependent upon the efforts and success of Defendants, and Plaintiffs have sufficiently alleged a common enterprise.

As for whether the profits were solely derived from the efforts of others, "[i]nvestments satisfy the third prong of the *Howey* test when the efforts made by those other than the investor are the ones which affect significantly the success or failure of the enterprise."[104] "The proper inquiry includes an examination of the investor's powers under the terms of the agreement, the information available to and the sophistication of the investor, adequacy of financing, degree of speculation, whether or not the risks involved were normal business risks, and so on."[105]

Defendants argue that Mr. Goldsmith is indistinguishable from any other commercial landlord because he is only entitled to fixed lease payments, payable regardless of Millrock Blytheville's ability to successfully manage the Blytheville Property. But, as explained above,

---

[101] *Id*. ¶ 53.

[102] By way of reminder, HSH purchased the Blytheville Property for $845,000. *Id*. ¶ 47. Mr. Goldsmith purchased the Property for around $2,829,478, nearly two million dollars more. *Id*. ¶ 61; *id*. ¶ 4.

[103] *WBK Shreveport LLC v. Kase Grp.*, 774 F. Supp. 3d 773, 782 (W.D. La. 2025).

[104] *Shields*, 744 F.3d at 645 (citation modified).

[105] *Id*. (citation modified).

"[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test."[106] "The fact that investors have bargained for a return on their investment does not mean that the return is not also expected to come solely from the efforts of others."[107] Here, the success of Mr. Goldsmith's investment "depended on the promises made both in the promotion and sale of the [P]roperty: the promised renovations and leaseback agreement."[108] Again, it was represented to Mr. Goldsmith that Defendants planned on making approximately eight to nine million dollars in improvements to the property.[109] To obtain the necessary financing for this, Defendants would have had to, as they represented they would,[110] solicit additional investors. To that end, as the PSA provided, the sale was expressly contingent on Mr. Goldsmith and Millrock "entering into a 100-year lease of the Property . . . which shall expressly permit [Millrock] to further develop the Property . . . and to assign fractional interests in the Lease to subsequent investors."[111] Furthermore, it was represented to Mr. Goldsmith that his investment would be completely passive,[112] and such a lack of control is reflected in the terms of the Lease. For example, Millrock Blytheville "shall be fully entitled to . . . make any and all changes, additions, improvements or repairs to the Leased Premises . . . without [Mr. Goldsmith's] prior written consent[,]" and Millrock Blytheville "shall be entitled to solicit, invest, borrow and encumber its lease hold interest in the Property as necessary to finance the construction, installation, maintenance and operation of all improvements to the Property."[113]

---

[106] *Edwards*, 540 U.S. 389, 394.
[107] *Id*. at 397.
[108] *WBK Shreveport LLC*, 774 F. Supp. 3d at 782.
[109] ECF No. 99 ¶ 49.
[110] *Id*.
[111] *Id*. ¶ 65.
[112] *Id*. ¶ 53.
[113] ECF No. 104, Ex. B at 5.2.

Millrock Blytheville, at its "sole cost and expense, shall maintain the Leased Premises in good order, condition and repair[,]" and Millrock Blytheville shall pay all utilities and taxes but for "federal or state income taxes, franchise taxes, or estate, inheritance or gift taxes, or any other income taxes assessed against Tenant or Landlord."[114] In sum, taking the well-pleaded allegations in the SAC as true, Plaintiffs have sufficiently alleged that the profits from this common enterprise derived solely from the efforts of the Defendants.

Because Plaintiffs have sufficiently alleged an investment of money in a common enterprise with profits derived solely from the efforts of others, they have sufficiently alleged under *Howey* a scheme that constitutes an investment contract. The Green Ivy Defendants' arguments that Plaintiffs have failed to state a claim for violations of Rule 10b-5 are, thus, unavailing. The Court will not dismiss this claim on these grounds, and the Court therefore denies the Green Ivy Defendants' Motion to Dismiss.[115]

### 2.    Heightened Pleadings Standards

Before the passage of the Private Securities Litigation Reform Act ("PSLRA"), Federal Rule of Civil Procedure 9(b) "set the standard for the level of particularity required when

---

[114] *Id*. at 6–7.

[115] The SAC grounds this Court's subject matter jurisdiction in federal question, 28 U.S.C. § 1331. ECF No. 99 ¶ 32. The Green Ivy Defendants argue that once Plaintiffs' federal securities fraud claim is dismissed, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims and dismiss the SAC in its entirety. To be sure, "[u]nder 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if 'the district court has dismissed all claims over which it has original jurisdiction.'" *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011). "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Id*. Here, however, the Court does not dismiss in its entirety Plaintiffs' federal securities fraud claim. Absent further argument from the parties, the Court will not decline to exercise supplemental jurisdiction over Plaintiffs' state law claims at this time and will not dismiss those claims on such basis.

pleading the elements of a securities fraud claim."[116] Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud and must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[117] However, "[i]n 1995, Congress heightened the pleading standard for federal securities fraud claims with the passage of the PSLRA."[118]

First, the PSLRA heightened the plaintiff's burden in pleading the first element of a Rule 10b-5(b) cause of action—"the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading."[119] The PSLRA requires as follows:

> [i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—
> (A) made an untrue statement of material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.[120]

---

[116] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003).

[117] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262 (2019) (citation modified).

[118] *Adams*, 340 F.3d at 1095.

[119] *In re Overstock Sec. Litig.*, 119 F.4th at 799.

[120] 15 U.S.C. § 78u–4(b)(1).

The PSLRA also heightened the standard for pleading the scienter element of a securities fraud action. While conditions of mind may be alleged generally under Rule 9(b), the PSLRA "impose[s] a more stringent rule[.]"[121] It provides that

> in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.[122]

Notably, because claims under Rule 10b-5(a) and (c) for market manipulation "require a showing of fraud and scienter, plaintiffs must allege each element under the heightened pleading standards . . . outlined above."[123]

The Millrock Defendants argue that the SAC fails to sufficiently plead the existence of untrue statements or omissions made by Mr. Smith, Millrock, or Millrock Blytheville. The Court first examines this issue with respect to Millrock and Millrock Blytheville before turning to Mr. Smith.

### a. Millrock and Millrock Blytheville

Plaintiffs argue that "[t]he core of this case is that . . . owners of Millrock and Millcreek withheld and disguised" certain information.[124] The Court notes that, based upon the SAC's allegations, this case appears to involve several highly enmeshed entities. The SAC alleges that Millcreek and Millrock shared owners and managers—Mr. Smith and Mr. Long—and were in practice often indistinguishable.[125] The SAC alleges that Millrock Blytheville was a wholly

---

[121] *Adams*, 340 F.3d at 1096.
[122] 15 U.S.C. § 78u–4(b)(1).
[123] *In re Overstock Sec. Litig.*, 119 F.4th at 801.
[124] ECF No. 105 at 5.
[125] ECF No. 99 ¶ 17.

owned subsidiary of Millrock[126] and that Millrock Blytheville was undercapitalized and entirely dependent upon intermingled funds from Millrock.[127] Furthermore, the SAC alleges that Mr. Long, an owner of Millrock, was also the managing agent for Millrock and Millrock Blytheville and that Mr. Long's roles in all of the involved entities were interwoven and mostly indistinguishable.[128] Drawing from these allegations, it appears to the Court that, while the Millrock Defendants only discuss Mr. Smith with relation to Millrock and Millrock Blytheville, the SAC plausibly sets forth that Mr. Long was, during the relevant period, acting on behalf of Millrock and Millrock Blytheville. And the SAC alleges that Mr. Long made multiple misrepresentations to Mr. Goldsmith during various meetings held in person and over Zoom from December of 2020 to March of 2021. "[I]t is well established that corporations act through their employees and agents[,]"[129] and given the allegations regarding Mr. Long's roles in Millrock and Millrock Blytheville, these statements could plausibly be attributable to those entities.

At least some of these statements include when they were made, who made them, how they were made, and why they were misleading as required under both Rule 9(b) and the PSLRA. As one example, at a meeting held via Zoom on December 28, 2020, Mr. Long allegedly represented to Mr. Goldsmith that Dr. Mahmood and other physicians from HSH would work from trailers on site during the expansion and development of the Property—the time when Mr. Goldsmith was to receive rent of $14,447.92 per month based upon the leaseback

---

[126] *Id.* ¶ 47.

[127] *Id.* ¶ 67.

[128] *Id.* ¶ 15.

[129] *Weber v. Colliers Int'l Grp.*, No. 2:25-cv-00162-DBB-DBP, 2026 WL 1650734, at *7 (D. Utah June 8, 2026).

arrangement.[130] The SAC further alleges that Mr. Long also represented that arrangements for this and the development had already been made and would be in place if Mr. Goldsmith made the purchase.[131] These representations go to the quality and safety of the investment and would influence any reasonable investor's decision. They are, thus, material.[132] And, as the SAC also sufficiently pleads, these material representations were false or misleading.[133] Allegedly, as Mr. Goldsmith later discovered, no preparations for construction were made, and no trailers were ever placed on site from which physicians could have worked temporarily.[134] The purported architectural plans were never provided to Mr. Goldsmith.[135] Dr. Mahmood had worked for HSH but had been fired before the Blytheville Property was sold to Mr. Goldsmith,[136] and he had never worked at nor been approached to work at the Blytheville facility.[137] Moreover, HSH was allegedly a shell company without any substantive operations or assets.[138]

As for the scienter element, under the PSLRA, a plaintiff must, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind."[139] In a securities fraud case, "scienter is a mental state embracing [1] intent to deceive, manipulate, or defraud, or [2] recklessness."[140] "In

---

[130] ECF No. 99 ¶ 49.

[131] *Id.*

[132] *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock.").

[133] *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1248–49 (10th Cir. 2022) ("To sufficiently plead falsity, the complaint must allege facts to support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." (citation modified)).

[134] ECF No. 99 ¶ 7.

[135] *Id.* ¶ 73.

[136] *Id.* ¶ 55.

[137] *Id.*

[138] *Id.* ¶ 44.

[139] 15 U.S.C. § 78u–4(b)(1) (emphasis added).

[140] *Pluralsight, Inc.*, 45 F.4th at 1258–59 (citation modified).

assessing the sufficiency of a plaintiff's allegations under the PSLRA, a court must consider the complaint in its entirety and decide whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."[141] "[A] complaint survives dismissal only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[142]

"[A]ssess[ing] all the allegations holistically," the Court finds that the SAC "supports an inference of scienter at least as compelling as any nonculpable inference[,]"[143] at least with respect to Mr. Long. According to the SAC, Mr. Long was a Vice President at Colliers, as well as an owner of Millcreek and Millrock and the managing agent for Millrock and Millrock Blytheville.[144] Mr. Long is alleged to have made multiple misrepresentations to Mr. Goldsmith, including that thorough due diligence had been done on the development partner and on the tenant.[145] And the SAC alleges that no real plans for development were made and that the tenant was in fact a shell company without any substantive operations or assets.[146] Such allegations, in addition to Mr. Long's "high-level leadership roles in multiple companies involved in this business operation,"[147] support a strong inference that Mr. Long knew that he had not performed the due diligence promised and that he knew many of his statements were false when he made them. Millrock and Millrock Blytheville's scienter follows from Mr. Long's.[148]

---

[141] *Id*. at 1259 (citation modified) (emphasis in original).
[142] *Id*. (citation modified).
[143] *Id*. at 1260.
[144] ECF No. 99 ¶¶ 14–15.
[145] *Id*. ¶ 58.
[146] *Id*. ¶¶ 7, 44.
[147] *Weber*, 2026 WL 1650734, at *8.
[148] *See id*. at *10 ("[A]ny scienter of Smart Cove would necessarily arise from Mr. Taylor's actions[.]"); *Okemos Home, LLC v. LGF Produce, LLC*, No. 17-cv-02786-MSK-KLM, 2019 WL

Therefore, for the reasons above, Plaintiffs have sufficiently met the heightened pleadings standards of Rule 9(b) and the PSLRA with respect to Millrock and Millrock Blytheville. The SAC thus states a claim against these Defendants under the first cause of action, and the Court denies Millrock and Millrock Blytheville's request to dismiss this claim against them.

                b.     *Mr. Smith*

Regarding Mr. Smith, in reviewing the SAC, it does not appear to the Court that the SAC specifies any statements made by Mr. Smith to Mr. Goldsmith as required under the PSLRA. The SAC alleges that Mr. Smith provided Mr. Goldsmith with an Investment Agreement but fails to provide any details as to whether Mr. Smith prepared this document or had control over its contents such that he may be responsible for the statements made therein.[149] It is also unclear when and where Mr. Goldsmith received this document. As for the marketing materials, the Court acknowledges that it is alleged that Mr. Smith was directly involved in the creation of Millcreek's marketing materials,[150] and the SAC does set forth specific statements from these materials.[151] However, even assuming that Mr. Smith could be held liable for these statements or for their dissemination, the SAC fails to articulate with sufficient particularity the "when" with respect to the marketing materials. It is alleged that some of the representations were made on

---

12248966, at *8 (D. Colo. Mar. 27, 2019) ("CFH and LFG's scienter follows necessarily from Mr. Wong's."); *Adams*, 340 F.3d at 1106 ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

[149] ECF No. 99 ¶ 59. Plaintiffs have not argued that this Investment Agreement constitutes a marketing material, and from the limited information presently before the Court, the Court cannot determine the precise nature of this document.

[150] *Id*. ¶ 30.

[151] *Id*. ¶¶ 40–42.

Millcreek's website,[152] but there are no allegations suggesting when, or if, Mr. Goldsmith

viewed or accessed the website. As for marketing materials that may have consisted of physical

mailings,[153] it is unclear when, or if, Mr. Goldsmith received and viewed these mailings.

Accordingly, Plaintiffs have failed to meet the requirements of Rule 9(b) and the PSLRA with

respect to Mr. Smith. They have, in turn, failed to state a claim against Mr. Smith under the first

cause of action. The Court will dismiss this claim against Mr. Smith without prejudice.[154]

**B.      FRAUD AND NEGLIGENT MISREPRESENTATION (COUNTS II & III)**

Millrock and Mr. Smith also seek dismissal of Plaintiffs' claims for common law fraud

and negligent misrepresentation against them.[155] This request is grounded in the argument that

Plaintiffs have failed to satisfy Rule 9(b) with respect to Millrock and Mr. Smith. To reiterate,

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

---

[152] *Id.* ¶ 40.

[153] *Id.* ¶ 38.

[154] "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). While the Millrock Defendants do not explicitly seek dismissals with prejudice of the claims, they argue that amendment would be futile because Plaintiffs did not meaningfully amend the SAC to cure the deficiencies the Court identified in its previous Order. ECF No. 97. The Court first notes that the issue of failing to cure previously identified deficiencies "is not identical to the futility issue." *CVB Inc. v. Corsicana Mattress Co.*, No. 1:20-cv-00144-DBB-DAO, 2024 WL 1436491, at *3 (D. Utah Apr. 3, 2024). Rather, a district court "may deny amendment for repeated failure to cure deficiencies by amendments previously allowed as well as futility of amendment." *Zakis v. MetTel*, No. 2:20-cv-00045-HCN-CMR, 2021 WL 11637036, at *1 (D. Utah Dec. 9, 2021) (citation modified). Here, the Court cannot at this point definitively say that amendment would be futile, and the Court does not feel that Plaintiffs have repeatedly failed to cure deficiencies such that dismissal with prejudice would be appropriate. The Court's previous Order addressed the issues more broadly, and Plaintiffs in large part cured the deficiencies identified in that Order. Therefore, the Court will dismiss this claim without prejudice.

[155] The SAC does not assert these claims against Millrock Blytheville. *See* ECF No. 99 at 22–23.

person's mind may be alleged generally." In Utah,[156] "negligent misrepresentation constitutes a form of fraud[;] therefore, the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure applies to negligent misrepresentation claims."[157]

As discussed above, Plaintiffs have met even the heightened requirements of the PSLRA with respect to Millrock. Since Plaintiffs' claims for common law fraud and negligent misrepresentation against Millrock are "based on the same misrepresentations . . . as the federal securities claim[] . . ., and because the [C]ourt already concluded above that Plaintiffs had sufficiently alleged securities fraud under the PSLRA,"[158] the Court also concludes that the common law fraud and negligent misrepresentation claims against Millrock have been pleaded with sufficient particularity under Rule 9(b). Accordingly, the Court will not dismiss these claims against Millrock.

However, as has also been discussed, Plaintiffs have failed to meet the requirements of Rule 9(b) with respect to Mr. Smith because the SAC fails to articulate with sufficient particularity the "when" of his involvement. As such, the Court will dismiss Plaintiffs' claims for common law fraud and negligent misrepresentation against Mr. Smith without prejudice.[159]

---

[156] "A federal court sitting in diversity applies the substantive law, including choice of law rules, of the forum state. This rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit." *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). Here, the parties do not appear to dispute that Utah law applies to the state law claims, and the Court thus applies Utah law.
[157] *Logan v. Bank of Am., N.A.*, No. 2:12-CV-00191-DN, 2012 WL 5874364, at *3 (D. Utah Nov. 20, 2012) (citing *Coroles v. Sabey,* 2003 UT App 339, ¶¶ 35–41, 79 P.3d 974).
[158] *DiTucci v. Ashby*, No. 2:19-CV-277-TC-PMW, 2020 WL 1249627, at *8 (D. Utah Mar. 16, 2020).
[159] *See supra* note 154.

## C.      UNJUST ENRICHMENT (COUNT V)[160]

The Millrock Defendants seek dismissal of Plaintiffs' unjust enrichment claim, arguing that Plaintiffs have failed to plausibly allege that Mr. Goldsmith conferred a benefit upon them. To state a claim for unjust enrichment under Utah law, a plaintiff must plead "(1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[161] "[A]llegations that a benefit was conferred on a corporation are insufficient to show that individual corporate officer defendants also received a benefit absent some basis for piercing the corporate veil."[162]

Here, the SAC asserts that "Plaintiffs conferred a benefit on the Defendants by making their investment in the Blytheville Property"—"Defendants each received a benefit from Plaintiffs in the form of commissions or other compensation paid from proceeds of the sale transaction; access to and direct use of the identifiable proceeds of the investment; and a perpetuation of the overall scheme."[163] The Millrock Defendants contend that these are merely conclusory assertions that fail to identify a benefit conferred upon them. With respect to Millrock and Millrock Blytheville, the Court disagrees. The SAC alleges that Mr. Goldsmith purchased the Property from Millrock Blytheville at an inflated price of around $2,829,478.[164] The SAC

---

[160] Count IV of the SAC asserts a claim for Breach of Fiduciary Duty against only the Green Ivy Defendants. ECF No. 99 at 24. As has been discussed, the Court has found the Green Ivy Defendants' arguments unavailing. *See supra* note 115. The Court will thus not further address the fourth cause of action in this Order.

[161] *Rawlings v. Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754.

[162] *Weber*, 2026 WL 1650734, at *30.

[163] ECF No. 99 ¶¶ 125–126.

[164] *Id*. ¶ 61; *id*. ¶ 4.

further alleges that Millrock Blytheville had no assets other than Mr. Goldsmith's invested money and that the funds between Millrock Blytheville and Millrock were intermingled.[165] Additionally, the SAC alleges that Millrock Blytheville and Millrock used Mr. Goldsmith's invested money to pay rent on the Property.[166] From these allegations, a reasonable inference can be drawn that Millrock Blytheville and Millrock received a benefit from Mr. Goldsmith in the form of his investment payment. The Millrock Defendants' argument thus fails with respect to Millrock Blytheville and Millrock.

With respect to Mr. Smith, however, the Court agrees that the SAC has failed to provide sufficient factual detail to plausibly allege that Mr. Smith received a benefit from Plaintiffs. Although Plaintiffs claim that "they are confident that discovery will show that [Mr.] Smith received kickbacks and referral or finder fees as well as money directly from each fraudulent transaction[,]"[167] they have failed to allege this in the SAC. There are no allegations, for instance, that Mr. Smith received a commission from the sale of the Property or that he made use in his personal capacity of Mr. Goldsmith's investment money, and Plaintiffs do not argue that some basis for piercing the corporate veil as to Mr. Smith exists. Therefore, the SAC fails to sufficiently state a claim for unjust enrichment against Mr. Smith, and the Court will dismiss this claim without prejudice.[168]

---

[165] *Id.* ¶ 67.
[166] *Id.* ¶¶ 67, 72.
[167] ECF No. 105 at 6.
[168] *See supra* note 154.

### D.      CIVIL CONSPIRACY (COUNT VI)

The Millrock Defendants argue that Plaintiffs' civil conspiracy claim must be dismissed against the Millrock Defendants because Plaintiffs have failed to adequately plead underlying torts against them. This argument misunderstands the nature of civil conspiracy under Utah law.

Civil conspiracy in Utah requires proof of the following elements: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[169] "The claim of civil conspiracy 'require[s], as one of [its] essential elements, an underlying tort.'"[170] "Thus, in order to 'sufficiently plead' a claim for civil conspiracy, a plaintiff is 'obligated to adequately plead the existence of such a tort.'"[171]

Notably, "[i]t is not necessary that each member of the conspiracy commit an unlawful act in furtherance of the conspiracy to be liable."[172] "Rather, a conspirator may be liable for a co-conspirator's unlawful acts in furtherance of the conspiracy."[173] This is because "[c]ivil conspiracy is essentially a tool allowing a plaintiff injured by the tort of one party to join and recover from a third party who conspired with the tortfeasor to bring about the tortious act or in other words, a method of imposing vicarious liability."[174] "In a conspiracy that results in tort liability, the cause of action for which the co-conspirators are ultimately held liable is not the tort

---

[169] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944.

[170] *Puttuck v. Gendron*, 2008 UT App 362, ¶ 21, 199 P.3d 971 (alteration in original) (quoting *Coroles v. Sabey*, 2003 UT App 339, ¶ 36, 79 P.3d 974).

[171] *Id.* (quoting *Coroles,* 2003 UT App 339, ¶ 36).

[172] *Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493; *see Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 12 n.4, 243 P.3d 508 ("Although . . . conspiracy to defraud requires proof of the underlying fraud, it is not necessary that the underlying fraud have been actually committed by each member of the conspiracy." (quotation modified)).

[173] *Id.*

[174] *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 803 (D. Utah 1988).

resulting in the harm, but for the conspiracy that led to the harm. These are separate and distinct causes of action[.]"[175]

As relevant here, the SAC asserts claims for common law fraud and negligent misrepresentation against Mr. Smith and Millrock, as well as several other Defendants. The Court has not dismissed these claims against Millrock, and the claims remain viable against other Defendants.[176] These claims are thus eligible to serve as underlying torts for the civil conspiracy claim. And while the Court has dismissed Plaintiffs' claims for common law fraud and negligent misrepresentation against Mr. Smith and these claims were not asserted against Millrock Blytheville, it does not necessarily follow that the claim for civil conspiracy must also be dismissed against them. Neither need to have actually committed the underlying fraud to be liable for civil conspiracy. The Millrock Defendants, including Mr. Smith and Millrock Blytheville, have thus failed to persuade the Court that dismissal of this claim against them is appropriate at this time. The claim for civil conspiracy remains, as asserted, pending against all Defendants.

## **ORDER**

For the reasons discussed above, it is HEREBY ORDERED that the Green Ivy Defendants' Motion to Dismiss (ECF No. 104) is DENIED.

IT IS FURTHER ORDERED that the Millrock Defendants' Motion to Dismiss (ECF No. 103) is GRANTED IN PART AND DENIED IN PART as follows:

1.  Counts I, II, III, and V are DISMISSED WITHOUT PREJUDICE against Defendant

---

[175] *Jedrziewski v. Smith,* 2005 UT 85, ¶ 10, 128 P.3d 1146.
[176] Neither Mr. Long nor Colliers filed a Motion to Dismiss, and Mr. Machlis's argument against these claims was that the Court should decline to exercise supplemental jurisdiction over them where Plaintiffs failed to sufficiently state their federal securities fraud claim. The Court has found Mr. Machlis's arguments on this point unavailing. *See supra* note 115.

Brent Smith.

2.   All other claims remain pending.

IT IS FURTHER ORDERED that Plaintiffs may, if appropriate, file a Motion for Leave

to File a Third Amended Complaint within twenty-one (21) days of this Order.

DATED this 28th day of July 2026.          BY THE COURT:

Ann Marie McIff Allen
United States District Judge